**Larry C. JONES, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 71S00–9402–CR–156.**

Supreme Court of Indiana.

Aug. 29, 1995.

---

**52**

Michael A. Dvorak, South Bend, for appellant.

Pamela Carter, Attorney General, Jodi Kathryn Rowe, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

Larry Jones was convicted of possessing 3.04 grams of cocaine with intent to deliver, a class A felony, Ind.Code Ann. § 35–48–4–1 (West Supp.1994), and sentenced to forty-five years in prison, with fifteen years suspended. The court enhanced this sentence by thirty years because Jones also was found to be an habitual offender, Ind.Code Ann. § 35–50–2–8 (West Supp.1994).

Jones presents four issues in this direct appeal:

1. Whether the trial court erred by admitting into evidence cocaine seized during a warrantless search of Jones' car after he gave consent to search, but before he was given *Pirtle* warnings;

2. Whether the court erred when it admitted Jones' taped confession;

3. Whether Jones' due process rights were violated when the court excluded as hearsay a statement allegedly made by an absent defense witness; and

4. Whether Jones was denied due process by the manner in which the trial judge advised that witness of his privilege against self-incrimination.

*Facts*

On March 20, 1992, Sergeant Paul Hammons of South Bend's Neighborhood Enforcement Service Team (N.E.S.T.) received a tip from a confidential informant that Larry Jones, a suspected drug dealer, was carrying crack cocaine in the gas cap compartment of his car. A second confidential informant had provided similar information earlier in the day.

Within one hour, a N.E.S.T. officer identified Jones' car outside of "My Brother's Place," a South Bend club. After Jones left the club and drove away, officers in three unmarked police cars and one marked car followed him. Aware that a police car was following, Jones stopped to allow it to pass. He was unaware that another police car was also following and resumed driving. A few minutes later, Jones stopped in the middle of the street to let a passenger depart.

Captain Fautz was directly behind Jones' car at this time. He turned on his police lights and spotlight and stopped Jones to cite him for obstructing traffic. Fautz asked to see Jones' license and registration. Jones gave Fautz his license, but did not have the registration. Fautz then asked Jones to exit his auto and to stand between it and the police car so that he could ask him questions in better light. As Jones did so, Corporal Walters parked in front of Jones' car, partially blocking it, and Sergeant Hammons pulled up behind Fautz' car. Both officers exited

their cars; Hammons stood about four or five feet behind Fautz on the driver's side and Walters stood in front of Jones' car on the passenger's side. Fautz asked Jones if the car and its contents belonged to him, which Jones answered affirmatively.

Fautz asked Jones if he could search Jones' car and Jones consented. Fautz told Jones that he did not have to let him search, "that he had the right to refuse," but Jones reaffirmed, saying, "Go ahead." Fautz then obtained a "permit to search form" from his car, walked back to where Jones was standing, gave him a copy, and began to read it aloud to him. As he did so, Hammons opened the gas cap compartment on the left rear of Jones' car. He saw what he recognized to be baggies of crack cocaine. Two more N.E.S.T. officers then arrived.

Fautz completed reading the first part of the form, which contained the *Miranda* rights, and asked Jones if he understood it. Jones replied that he did, and Fautz read the second portion, which covered vehicle searches. When Fautz completed this portion, Jones announced that he did not want his car to be searched. Just as Fautz turned toward Hammons to tell him that Jones withdrew his permission to search, Hammons approached and said, "It's too late, I've already found it." Fautz then seized the cocaine baggies, took Jones into custody, and had him transported to the police station.

At the station, Fautz again Mirandized Jones. Jones acknowledged that he understood his rights and told Fautz that he "wanted to work," i.e., to act as an informant. With the prosecutor's consent, narcotics officers agreed not to file charges against Jones in exchange for his work as an informant. The only conditions the officers and prosecutor placed on the agreement were that Jones must call them by 4 p.m. the next day and must produce useful information within three days. Jones accepted the offer.

Fautz asked Jones if he would give a taped statement before he left the station, and Jones agreed. Fautz read *Miranda* warnings to Jones for the third time, and again

Jones confirmed that he understood. Jones next confessed to possessing the cocaine and preparing it for sale as crack; he named some cocaine suppliers in South Bend whom he knew. Shortly thereafter, the police cited Jones for his traffic and registration infractions and released him.

Jones neither called the narcotics division by 4 p.m. the next afternoon nor provided any worthwhile information. As a result, he was charged with possession with intent to distribute, felony possession, and being an habitual offender.

On the first day of trial Jones announced his intention to call only one witness, Myron Wilder, explaining that Wilder would testify that he was paid by someone to plant the cocaine in Jones' car. Judge Frese asked the prosecutor if the State was giving Wilder immunity for his testimony, and she responded that none would be given. The judge then swore Wilder and warned him of the penalties for perjury, his right against self-incrimination, and his right to the assistance of counsel. Wilder stated that he wanted to speak to an attorney. Judge Frese ordered Wilder to remain near the courtroom and summoned a public defender. A few minutes later, Wilder told Judge Frese he had changed his mind about wanting an attorney, but the judge was not convinced that Wilder understood his rights. The Judge repeated his order that Wilder remain near the courtroom. Nevertheless, Wilder left the courthouse, and he remained incommunicado until the three-day trial ended, notwithstanding the issuance of a bench warrant.

Upon learning of Wilder's disappearance, Jones' lawyer moved to withdraw from his client's representation so that he could testify about inculpatory statements Wilder uttered that morning. Judge Frese denied the motion and proceeded with the trial. Jones neither testified nor put on any evidence in defense.[1]

## I. Admissibility of the Narcotics

■ Jones contends that the cocaine seized after the search of his car should have

1. Jones was convicted of dealing in cocaine and possession of cocaine. The court merged these counts and dismissed a charge of possession of a

Schedule IV Controlled Substance. The jury also found Jones to be an habitual offender.

been suppressed because he did not give a valid consent to search. He says he was in custody at the moment the officers asked for his consent and thus was entitled to be warned of his right to consult counsel before deciding whether to consent. He further argues that his consent was not voluntary.

The Fourth Amendment to the U.S. Constitution and Article I, Section 11 of the Indiana Constitution provide "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures...." U.S. CONST, amend. IV; IND. CONST., art. 1 § 11. Created to protect one's right to privacy, this protection against unreasonable, State-sponsored searches and seizures is "a principal mode of discouraging lawless police conduct." *Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). Consequently, evidence obtained through an unreasonable search and seizure is not admissible. *Callender v. State* (1923), 193 Ind. 91, 138 N.E. 817.

The warrant requirement commands that an agent of the government obtain a search warrant from a neutral, detached magistrate prior to undertaking a search of either a person or private property, except under special circumstances fitting within "certain carefully drawn and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514–15, 19 L.Ed.2d 576 (1967); *Murrell v. State*, (1981), Ind., 421 N.E.2d 638. One such circumstance occurs when consent is given to the search. The theory underlying this rule is that when an individual gives permission to a search of either his person or property, governmental intrusion thereon is presumably not unreasonable. Consent must be freely and voluntarily given, and not the result of duress or coercion, express or implied, to be effective. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (to sustain consent for search given by person *not* in custody, government need show only that consent was voluntary in fact).

Indiana law on consent given while in custody derives from *Pirtle v. State*, (1975), 263 Ind. 16, 323 N.E.2d 634. Pirtle was in police custody due to an arrest for possession of a stolen automobile. *Id.* at 21, 323 N.E.2d at 636. The police read *Miranda* rights to him in the squad car and again at the police station. *Id.* at 22, 323 N.E.2d at 637. Pirtle did not waive his rights either time and requested to speak to an attorney when questioned at the station. Though counsel was not provided, approximately twelve hours later two other officers questioned Pirtle again. One asked for permission to search his apartment, which Pirtle authorized. The police searched the apartment and discovered witnesses and direct evidence linking Pirtle to a homicide. *Id.*

Pirtle challenged admission of that evidence, and we held that "a person who is asked to give consent to search *while in police custody* is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Id.* at 28, 323 N.E.2d at 640 (emphasis added). We noted the U.S. Supreme Court's observation in *Miranda* that "the atmosphere of in-custody interrogation was inherently coercive." *Id.* at 22, 323 N.E.2d at 637 (quoting *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). We observed that the guarantees of an accused's right to counsel in both the Sixth Amendment and Art. I, Section 13 of the Indiana Constitution apply " 'at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.' " *Id.* at 26, 323 N.E.2d at 639 (citing *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 1931–32, 18 L.Ed.2d 1149 (1967)). Because Pirtle was not afforded counsel after he requested it, he "could have no conception of the extent of his Fourth Amendment rights." *Id.*

We extended the *Pirtle* rule by holding that a person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given. *Sims v. State* (1980), 274 Ind. 495, 413 N.E.2d 556. We held that giving an arrestee *Miranda* warnings before commencing interrogation does not sufficiently inform him of his right to consult with counsel prior to consenting to a search. *Id.* at 499–500, 413

N.E.2d at 559; [2] *but see Martin v. State* (1986), Ind., 490 N.E.2d 309 (reminding of consent form read to accused twenty-five minutes earlier was sufficient for valid consent to search). Because Jones claims he was entitled to receive a warning about consultation with counsel before consenting to the search of his car, we must determine whether his right to receive the warning had attached. This right can only be said to have attached if Jones was *in custody* when he consented to the search.

▮▮▮ A seizure implicating the Fourth Amendment occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Because of "the limited nature of the intrusion," brief investigative detentions may be justified on less than probable cause. *United States v. Brignoni–Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579–80, 45 L.Ed.2d 607 (1975). Accordingly, not all seizures of the person equate to arrests [3] and not all questioning pursuant to a seizure and brief investigative detention amounts to custodial interrogation. *See, e.g., United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (routine border stop and request for identification permissible); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (stop and detention for fingerprinting permissible).

▮▮▮ Neither Federal nor Indiana constitutional jurisprudence has developed a "bright line" test for determining when an investigatory detention moves beyond merely a *Terry* stop and becomes an arrest or custodial interrogation. The rule largely applies an objective test asking whether a reasonable person under the same circumstances would believe that she was under arrest or not free

to resist the entreaties of the police. *Florida v. Bostick,* 501 U.S. 429, 433–34, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991).[4] We have considered whether a person was in custody and thus entitled to warnings in a variety of settings.

In *Peterson v. State* (1987), Ind., 514 N.E.2d 265, the accused was stopped on the street by two police officers and asked to identify himself. They asked to search his car and hotel room, and he consented. At trial, the accused contested the admission of drug paraphernalia and a gun found during the search, claiming he was not apprised of his *Pirtle* right. Ultimately, we found he was not entitled to the *Pirtle* warning because he was not in custody when he gave his consent. *Id.* at 272. In so doing, we explained the accused was subject to "a limited seizure of the person, namely an investigatory stop, supportable by knowledge of the officer of facts which would warrant a man of reasonable caution in believing that the limited action taken was appropriate." *Id.* at 271–2 (citing *Terry,* 392 U.S. 1, 88 S.Ct. 1868).

Moreover, in *Huspon v. State* (1989), Ind., 545 N.E.2d 1078, we found an individual's consent was a valid waiver of his Fourth Amendment right, absent the State's provision of his *Pirtle* warnings, because he was not *in custody.* Huspon claimed he was "in custody" because he was alone in his room with two police officers when they requested his consent. We held otherwise, explaining that "appellant was unrestrained and had no reason to believe he could not leave," explaining that it was his "perception of his position as to whether he reasonably believed his freedom of movement would have been curtailed by police" which was relevant in deter-

---

2. "[N]o inference would arise in the mind of the person about to be questioned from the administration of the *Miranda* advisement, that there is a right to confer with counsel in deciding whether to consent to a search of one's dwelling. The court was in error in finding an explicit waiver on this basis, and appellant was entitled to the exclusion of the items seized pursuant to his consent." *Id.* at 559.

3. "Arrest is the taking of a person into custody, that he may be held to answer for a crime." Ind.Code Ann. § 35–33–1–5 (West 1986). Custody means "[t]he care and control of a thing or person." *Black's Law Dictionary* 384 (6th ed. 1990).

4. As Justice O'Connor aptly pointed out in *Bostick,* the objective test is that of a reasonable *innocent* person. *Id.* at 433–34, 111 S.Ct. at 2386.

mining whether he was in custody. *Id.* at 1081.

The facts of *Pirtle, Peterson* and *Huspon* make clear that Jones was not in custody when he consented to the search of his vehicle. It is obvious that Jones was seized within the Fourth Amendment when he was stopped for obstructing traffic and then asked to exit his car. It is readily apparent, however, that Jones was neither arrested nor in police custody during the initial traffic stop. Although the number of officers present for a traffic stop was unusually high, none of officers touched Jones or physically restrained his freedom of movement before the moment he consented to a search of his car, and Jones was not asked incriminating questions. Jones was never in the care and control of the police or interrogated in a manner implicating the Fifth Amendment and necessitating the giving of *Miranda* warnings. The instant case contrasts starkly to *Pirtle*, in which the defendant was asked for consent to search his home while he was in jail, detained for more than twelve hours, and after his right to counsel had been denied.

▇ Furthermore, the procedure governing the stop obligated Fautz not to detain Jones any longer than necessary, but not to recite his *Miranda* rights. Ind.Code Ann. § 34-4-32-2 (West 1983). Had Jones refused to give the police permission to search, he would have been given two citations and been free to leave. The police had no right even "to frisk" the vehicle without Jones' consent, and they would have had no option but to cease detaining him. Thus, we conclude that at the moment Jones was asked for permission to search his car, the prosecutorial process had not yet begun against him and *Pirtle* and *Sims* rights had not attached.

▇ Because Jones' consent to search was not constitutionally defective, the seizure of the cocaine was proper. The fact that Jones rescinded his consent does not affect the constitutionality of this search because the rescission was made too late; it came after the police discovered the drugs. The trial judge properly denied Jones' motion to suppress evidence seized during this search of his car.

### II. Suppression of the Confession

▇ Jones asserts two errors regarding admission of his confession. He first claims the confession is "fruit of the poisonous tree," but we have concluded above that the search of the car which preceded the confession was constitutional. Jones' second claim, that his confession was not free and voluntary because he was induced to incriminate himself by promises of immediate freedom, is not supported by the evidence.

▇ The decision whether to admit a confession is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion. Admission of a confession into evidence is conditioned upon the State proving beyond a reasonable doubt that the defendant knowingly and intelligently waived his rights not to incriminate himself and to have the presence of counsel during questioning. *Collins v. State,* (1987), Ind., 509 N.E.2d 827. When reviewing a challenge to trial court's decision to admit a confession we examine the record for substantial, probative evidence of voluntariness; we do not reweigh the evidence. *Id.*

The evidence largely rebuts Jones' contention. He made his inculpatory statements after affirming that he understood his rights when an officer recited them to him. He volunteered his knowledge about the South Bend cocaine trade and offered "to work" for the police earlier. Jones made his offer *before* police told him he would be released that night. Only then did police ask him to give a taped statement; the promise of release was not a bribe for his confession. Most important, Jones was fully informed of his *Miranda* rights at the outset of his taped statement, and he confirmed that he knew and understood them. Judge Frese appropriately denied Jones' motion to suppress the confession.

### III. Admission of Wilder's Statements

▇ Jones' third contention is that he was denied due process of law when his attorney was not permitted to testify about the remarks of Myron Wilder. A ruling on such evidentiary matters is within the sound

discretion of the trial judge and does not amount to a violation of a defendant's right to due process of law unless it deprives the defendant of a fair trial. *See Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Here, there is ample support for the judge's decision to exclude this hearsay evidence.

Jones was tried before the Indiana Rules of Evidence became effective in 1994, therefore this claim is governed by the similar Federal Rules of Evidence § 804(b)(3) hearsay exceptions based on the unavailability of the speaker, which we adopted in 1991.[5] *Thomas v. State,* (1991), Ind., 580 N.E.2d 224. This rule permits a trial court to admit some hearsay evidence when the declarant is unavailable but there is sufficient indicia of the statement's trustworthiness.

Assuming for the sake of argument that Wilder's departure rendered him unavailable, the trial court was justified in excluding the alleged statements because there were no corroborating circumstances indicating their trustworthiness. These statements, suddenly made to defense counsel on the morning the trial is scheduled to begin, were uncorroborated and contradicted Jones' own admissions. Wilder's flight from the courthouse, despite being subject to a court order to remain there, also cast doubt on the veracity of his remarks. The circumstances demonstrate that Judge Frese neither deprived Jones of due process when he excluded such unreliable evidence nor abused his discretion when he denied counsel's motion to withdraw.

*IV. The Warning to Wilder*

█ Jones' final argument is that the trial judge deprived him of a fair trial and fundamental due process by threatening the sole defense witness and driving him from the witness stand. Jones cites *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), as support, but this case is distinguishable from *Webb.* In *Webb,* the trial judge told the witness, a prisoner, that if he perjured himself that the judge would "personally see that your case goes to the grand jury," that if the witness would "get on the

witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve," and that it would be held against the witness when he is up for parole. *Id.* at 96, 93 S.Ct. at 352–53. The Supreme Court held that these remarks exerted "such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98, 93 S.Ct. at 353–54.

The events here were rather different, to say the least. Jones' witness, Wilder, stated a desire to speak with his own attorney before testifying. The fact that he later expressed an interest in going forward with testifying, though of some probative value, is not dispositive of a knowing and intelligent waiver of rights. If anything, it suggested the witness' knowledge of his rights was not very solid. The proper judicial response under the circumstances was the one taken: to wait until the witness spoke with counsel. The warnings were hardly judicial threats.

Moreover, Wilder's sudden entry into the proceedings on the day of trial justifiably aroused the court's concern. Defense counsel was so unsure of Wilder's proposed testimony that he moved for a continuance to depose the witness before calling him to testify. Wilder's proposed testimony was likely to subject him to criminal sanctions whether it was true or false. Ultimately, the judge's attention to Wilder was not gratuitous, but cautious and prudent. We therefore conclude that the court did not violate Jones' due process rights in advising Myron Wilder of his constitutional rights in the manner he chose.

*V. Conclusion*

We affirm the judgment of the trial court on all issues.

DeBRULER, SULLIVAN and SELBY, JJ., concur.

DICKSON, J., dissents without opinion.

---

**5.** Federal Rule of Evidence 804(b)(3) is superintended by the definitions of unavailability contained in Rule 804(a). Indiana Evidence Rule 804(a) tracks the definitional language word for word.