**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 14 2013, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD E.C. LEICHT**
Kokomo, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KEVIN PENDLETON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 34A05-1207-CR-383 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HOWARD SUPERIOR COURT
The Honorable William C. Menges, Judge
Cause No.  34D01-1105-FA-415

**February 14, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Kevin Pendleton ("Pendleton") was convicted after a jury trial of two counts of Conspiracy to Commit Dealing in Cocaine, as Class B felonies.[1] He now appeals his convictions.

We affirm.

**Issues**

Pendleton raises three issues for our review, which we restate as:

  I.   Whether the trial court committed fundamental error when it permitted the State to amend the charging information to add a second count for Conspiracy to Commit Dealing in Cocaine, when the amendment occurred after the omnibus date;

 II.   Whether the trial court abused its discretion when it overruled certain of Pendleton's objections to the admission of evidence at trial; and

III.   Whether the trial court erred when it denied Pendleton's motion for a directed verdict.

**Facts and Procedural History**

Pendleton's convictions arise from a Kokomo Police Department investigation involving the use of a confidential informant ("the CI") and targeting Pendleton. During the events giving rise to this case, Pendleton lived at 623 South Walnut Street in Kokomo ("623 South Walnut").

On April 6, 2011, Kokomo Police Detectives Brad Reed ("Detective Reed") and Gary Taylor ("Detective Taylor") met with the CI, who occasionally assisted Detective Reed with investigations during 2011 and 2012. The CI had agreed with Detective Reed to purchase

---

[1] Ind. Code §§ 35-41-5-2(a) & 35-48-4-1(a).

cocaine from Jeffrey and Tonya Dunham (separately, "Jeffrey" and "Tonya"; collectively, "the Dunhams"), who lived at 719 South Union Street in Kokomo ("719 South Union").

After searching the CI to ensure she had no money or drugs on her person, Detective Reed recorded a phone call from the CI to the Dunhams arranging to purchase $50 worth of cocaine. Detective Reed wired the CI with audio and video surveillance equipment and assigned various other officers to perform surveillance on the scene or to follow vehicles to and from 719 South Union on an as-needed basis. Detective Reed then drove the CI to 719 South Union to engage in the controlled purchase.

The CI entered the Dunhams' residence and gave Jeffrey the $50 in cash. While Tonya remained at 719 South Union with the CI, detectives observed Jeffrey leave the residence, get into an older Ford Ranger pickup truck, and drive to 623 South Walnut.[2] After a few minutes, Jeffrey returned to 719 South Union with crack cocaine, which he gave to the CI. The CI in turn left a small amount of the cocaine with the Dunhams as payment for their service in obtaining the drugs. Before leaving the Dunhams' home, the CI asked if they could arrange to provide her with powdered cocaine. Jeffrey and Tonya told the CI that they required twenty-four hours' notice to arrange such a transaction with an individual they called "KP." The CI requested that they do so, and the Dunhams indicated that the CI could return the following day, April 7, 2011, to purchase the powdered form of the drug.

With the transaction completed, the CI left 719 South Union, got into Detective Reed's car, and turned the crack cocaine over to him. The CI agreed to meet Detective Reed

---

[2] The address was later determined to be Pendleton's residence. See infra.

again the next day to purchase powdered cocaine from the Dunhams, and confirmed the planned transaction in a phone call with the Dunhams later on the night of April 6.

On April 7, 2011, the CI again met with Detective Reed, who provided $100 in cash for the CI to purchase drugs from the Dunhams at 719 South Union. Detective Reed had already recorded the serial numbers for the $20 bills that he provided to the CI. He again recorded the CI's phone call with Tonya, wired the CI with surveillance equipment, assigned officers to engage in surveillance of the scene and vehicles, and drove the CI to the Dunhams' residence.

When the CI entered 719 South Union, only Tonya was present. The CI gave Tonya the $100 in cash, and Tonya called Pendleton, who drove a black GMC Jimmy SUV to the back of 719 South Union. Tonya provided the money to Pendleton, who then left 719 South Union in the SUV to obtain the drugs.

After Pendleton left, Detective Reed contacted Kokomo Police Officer Drew Wallsmith ("Officer Wallsmith") and requested that he stop Pendleton's vehicle. Detective Reed had intended for Officer Wallsmith to arrest Pendleton but learned through a cell phone call to the CI that Pendleton had not yet delivered the drugs to her and had left to retrieve the cocaine. Because the transaction had not yet been completed and he wanted to complete the controlled purchase of the cocaine, Detective Reed instructed Officer Wallsmith to determine if there was another basis for stopping Pendleton's vehicle. Officer Wallsmith observed that the window tint on the SUV was too dark for him to readily identify the driver or whether there were any other individuals in the vehicle, and saw that the license plate frame and a

4

tinted cover blocked or obscured the license plate.

Based upon these observations, Officer Wallsmith initiated a traffic stop of Pendleton's vehicle. Detective Reed asked Officer Wallsmith to talk to Pendleton and to attempt to determine whether Pendleton had money on his person and, if so, what the serial numbers for the bills were.

When Officer Wallsmith requested Pendleton's license and registration, Pendleton produced his driver's license, which identified him and stated his residence as 623 South Walnut. Pendleton was unable to readily produce his vehicle's registration and began rapidly searching through the vehicle's glove compartment and console. Officer Wallsmith, now concerned for his safety, requested that Pendleton exit the vehicle.

Pendleton complied, and Officer Wallsmith conducted a pat-down search of Pendleton to ensure he did not have any weapons on his person. After feeling what he believed to be folded cash in Pendleton's front right pocket, Officer Wallsmith asked Pendleton for permission to reach into Pendleton's pocket to retrieve the money. Pendleton consented to this. Officer Wallsmith returned to his patrol car and contacted Detective Reed, who asked Officer Wallsmith to record the serial numbers of the bills and to read the numbers to him. After recording the information and providing it to Detective Reed, Officer Wallsmith completed a written warning for overly-dark window tint; the ticket also recorded Pendleton's name and address. Officer Wallsmith gave the cash and the written warning to Pendleton and permitted Pendleton to leave.

Pendleton had informed Tonya by phone of the traffic stop, and further told her that he

5

would be changing vehicles. After Pendleton left the stop, he changed vehicles and returned to 719 South Union in a blue minivan. He delivered crack cocaine to Tonya, who gave the drugs to the CI.[3] The CI gave a portion to Tonya as a fee for arranging the purchase, left the Dunhams' residence, and returned to Detective Reed's car. Once in Detective Reed's car, the CI gave the purchased drugs to Detective Reed and was searched and debriefed.[4]

On May 20, 2011, the State charged Pendleton with one count of Conspiracy to Commit Dealing in Cocaine, as a Class A felony, and a warrant was issued for his arrest.[5] Pendleton was arrested on May 27, 2011.

An initial hearing was conducted on June 16, 2011. During the initial hearing, the trial court set an omnibus date of August 19, 2011, and a trial date of September 16, 2011. The trial date was reset on numerous occasions due to court congestion and continuances sought by both parties.

On November 22, 2011, Pendleton filed a motion to suppress evidence, which challenged the admissibility of the evidence obtained as a result of Officer Wallsmith's stop, pat-down search, and search of Pendleton's pocket on April 7, 2011. On December 2, 2011, a hearing was conducted on the motion to suppress, at the conclusion of which the trial court denied Pendleton's motion in all respects.

---

[3] Despite prior arrangements with the Dunhams, the CI was unable to obtain powdered cocaine during the transaction on April 7, 2011.

[4] The CI was unable to obtain powdered cocaine during the transaction, and instead was provided with crack cocaine.

[5] The charge was elevated to a Class A felony under Indiana Code section 35-48-4-1(b)(3)(B)(i), which defines as a Class A felony dealing in cocaine where the offense is committed "in, on, or within one thousand (1,000) feet of … school property."

6

On January 5, 2012, several months after the omnibus date of August 19, 2011, the State moved to amend the charging information to add an additional charge of Conspiracy to Commit Dealing in Cocaine, as a Class B felony. The trial court granted the State's motion without objection from Pendleton. Also on January 5, 2012, Pendleton filed a motion to continue the trial.

A jury trial was ultimately conducted from April 16 to April 18, 2012. During the trial, Pendleton objected to the admission of evidence obtained as a result of the April 7, 2011 traffic stop Officer Wallsmith had conducted, including the serial numbers for the $20 bills Pendleton had obtained from Tonya, which numbers Officer Wallsmith obtained on Detective Reed's instructions. The trial court overruled Pendleton's objections and admitted the associated testimony and exhibits into evidence.

At the close of the State's case-in-chief, Pendleton moved for directed verdicts on each of the charges against him. The trial court granted the motion as to Conspiracy to Commit Dealing in Cocaine, as a Class A felony, but denied the motion as to both charged offenses as Class B felonies.[6] At the trial's conclusion, the jury found Pendleton guilty of the two counts of Conspiracy to Commit Dealing in Cocaine, as Class B felonies.

On June 27, 2012, a sentencing hearing was conducted, at the conclusion of which the trial court entered judgments of conviction against Pendleton and sentenced him to twenty years imprisonment for each count, with fifteen years executed and five years suspended to

---

[6] Evidence at trial indicated that while there was a private school within 1,000 feet of 719 South Union, classes were not in session and there were neither students nor staff present at the school on the days of April 6 and 7, 2011.

probation for each, and with the sentences to be served concurrent to one another.

This appeal ensued.

**Discussion and Decision**

Amendment of Charging Information after Omnibus Date

The first argument Pendleton raises for our review contends that the trial court committed fundamental error when it granted the State's motion, filed after the omnibus date, to amend the charging information to add a count for Conspiracy to Commit Dealing in Cocaine.

Indiana Code section 35-34-1-5 sets forth the procedure by which a charging information may be amended for both matters of substance and defects that are "immaterial." I.C. § 35-34-1-5(a). Where the amendment is immaterial or addresses a defect, imperfection, or omission in form that does not prejudice the defendant's substantive rights, it may be made any time. I.C. §§ 35-34-1-5(a) & (c).

Where an amendment relates to a matter of substance, however, the statute specifies time limits within which the amendment must be made:

> The indictment or information may be amended in matters of substance and the names of material witnesses may be added, by the prosecuting attorney, upon giving written notice to the defendant at any time:
>
> (1) up to:
>
> (A)   thirty (30) days if the defendant is charged with a felony…
>
> before the omnibus date; or
>
> (2) before the commencement of trial;
>
> if the amendment does not prejudice the substantial rights of the defendant.

8

I.C. § 35-34-1-5(b). "A defendant's substantial rights include a right to sufficient notice and an opportunity to be heard regarding the charge." Baker v. State, 922 N.E.2d 723, 729 (Ind. Ct. App. 2010) (citations and quotations omitted), aff'd on reh'g, 928 N.E.2d 890, aff'd in relevant part on trans., 948 N.E.2d 1169 (Ind. 2011).

Our supreme court set forth the test for whether an amendment is a matter of substance in Fajardo v. State:

> An amendment is one of form, not substance if both (a) a defense under the original information would be equally available after the amendment, and (b) the accused's evidence would apply equally to the information in either form. And an amendment is one of substance only if it is essential to making a valid charge of the crime.

859 N.E.2d 1201, 1207 (Ind. 2007). Here, a one-count charging information was amended to add a charge for criminal activity that, while related to the initially-charged offense, was a separate alleged criminal act. We therefore conclude that the amendment was one of substance.

Whether there was an amendment after the statutorily-specified date is not the end of the inquiry, however. Ordinarily, we would turn to the question of whether Pendleton's substantial rights were prejudiced by the State's amendment of the charging information adding a second count of Conspiracy to Commit Dealing in Cocaine. However, Pendleton did not contemporaneously object to the amendment. Rather, the same day that the motion to amend the information was filed, Pendleton sought a continuance, and our review of the record reveals that Pendleton did not challenge the amendment of the charging information at any point before trial.

9

Where a party fails to object to a trial court's order contemporaneously with that decision, ordinarily an issue on appeal is waived. Absher v. State, 866 N.E.2d 350, 354-55 (Ind. Ct. App. 2007). Acknowledging as much, Pendleton argues that the trial court's decision granting the State's motion to amend the charging information amounted to fundamental error. "[F]undamental error is only available in egregious circumstances." Id. at 355. The mere fact of prejudicial error is not sufficient to establish that there was fundamental error. Id. Rather, "'an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible' and must 'constitute a blatant violation of basic principles, the harm or potential harm must be substantial, and the resulting error must deny the defendant fundamental due process.'" Id. (quoting Benson v. State, 762 N.E.2d 748, 755 (Ind. 2002).

Here, the added charge arose from a course of events that all parties acknowledge was tied to the facts of the originally-filed charge: Pendleton's alleged delivery of cocaine to the Dunhams, who in turn sold the drugs to the CI. The events occurred on consecutive days and involved the same parties to the two transactions. After the amended charging information was filed, Pendleton was afforded a continuance, as was the State, and a trial was conducted more than three months after the filing of the amended charging information.

Further, we observe that Pendleton presented no evidence at trial. Rather, he sought to exclude from evidence the results of Officer Wallsmith's traffic stop and pat-down search. Pendleton had already sought to suppress this evidence several months before the filing of the amended charging information, and makes no claim now that the timing of the trial

10

prejudiced his ability to prepare a defense to the charges.

In light of all this, we cannot conclude that the belated amendment was prejudicial to Pendleton at all—let alone that any error might have arisen to the level of fundamental error. We therefore leave the judgment undisturbed in the face of Pendleton's challenge to the timing of the amended information.

Suppression of Evidence from the Traffic Stop and Search

We turn now to Pendleton's second issue on appeal, whether the trial court erred when it denied his motion to suppress evidence obtained from Officer Wallsmith's traffic stop of Pendleton's vehicle and subsequent pat-down search of Pendleton's person.

"Our standard of review of rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by trial objection." Boston v. State, 947 N.E.2d 436, 444 (Ind. Ct. App. 2011). We determine whether there is substantial evidence of probative value to support the trial court's ruling. Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). We do not reweigh evidence and construe conflicting evidence most favorably to the trial court's ruling. Widduck v. State, 861 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). We must also consider uncontested evidence favorable to the defendant. Id. The trial court's ultimate determination of the constitutionality of a search or seizure is, however, reviewed de novo. Harper v. State, 922 N.E.2d 75, 79 (Ind. Ct. App. 2010), trans. denied.

Here, Pendleton contends that Officer Wallsmith's pretextual stop of his vehicle and Officer Wallsmith's subsequent custodial search of his person violated the Indiana

11

Constitution. We address each of Pendleton's claims in turn.

*Traffic Stop*

We first address Pendleton's claim that Officer Wallsmith's pretextual stop of his vehicle was unconstitutional and that the trial court erred when it overruled his objections to the admission of evidence obtained as a result of the stop. The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. The Indiana Constitution includes a nearly-identical provision. Ind. Const. art. I, § 11; Mitchell v. State, 745 N.E.2d 775, 785-86 (Ind. 2001).

Our supreme court has, however, "made an explicit point to interpret and apply Section 11 independently from federal Fourth Amendment jurisprudence." Id. at 786.

> In resolving challenges under this section, we consider the circumstances presented in each case to determine "whether the police behavior was reasonable." The State has the burden of showing the intrusion was reasonable in light of the totality of the circumstances. A police stop and brief detention of a motorist is reasonable and permitted under Section 11 if the officer reasonably suspects that the motorist is engaged in, or about to engage in, illegal activity. "Reasonable suspicion exists if the facts known to the officer, together with the reasonable inferences arising therefrom, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur." Pretextual stops are not, per se, unreasonable under the Indiana Constitution.

Turner v. State, 862 N.E.2d 695, 699 (Ind. Ct. App. 2007) (citations omitted) (quoting Mitchell, 745 N.E.2d at 786-87).

Thus, police officers may stop an individual's vehicle when they observe minor traffic

violations. State v. Quirk, 842 N.E.2d 334, 340 (Ind. 2006). "A traffic violation, however minor, creates probable cause to stop the driver of the vehicle." Id. Thus, where a police officer initiates a traffic stop of a vehicle upon observing a traffic violation, that stop is not unreasonable under the Indiana Constitution, even where the stop is a pretextual one. Id.; Osborne v. State, 805 N.E.2d 435, 439 (Ind. Ct. App. 2004), trans. denied.

Here, Officer Wallsmith received information from Detective Reed that Pendleton was involved in an ongoing narcotics transaction. Detective Reed asked Officer Wallsmith to stop Pendleton's vehicle, and also asked that Officer Wallsmith identify a basis for the stop that was independent of the narcotics sale. Officer Wallsmith identified two violations: the too-dark tint of the windows of Pendleton's SUV, and the obscuring of text on the vehicle's license plate. Officer Wallsmith issued a written warning for the darkness of the tint on Pendleton's vehicle, and Pendleton does not contend that Officer Wallsmith was incorrect in identifying either the window-tint violation or the license plate violation for which no warning or citation was issued.

Thus, while Pendleton may be correct that the stop was a pretextual one, we cannot conclude that Officer Wallsmith lacked probable cause.

*Pat-Down Search*

Having found no error in the trial court's conclusion that Officer Wallsmith's stop of Pendleton's SUV was supported by probable cause, we next examine whether the trial court erred when it admitted evidence obtained from the pat-down search of Pendleton.

The United States Supreme Court has held that a police officer may, during an

investigatory stop of an individual, conduct a pat-down search of the individual "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry v. Ohio, 392 U.S. 1, 27 (1968). The officer need not be certain the individual is armed. Id. Rather, a pat-down search for weapons is constitutionally permissible where a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger. Id. An "inchoate and unparticularized suspicion or 'hunch'" does not suffice to show that an officer acted reasonably in conducting a pat-down search. Id. Rather, "due weight must be given … to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." Id.

Officer Wallsmith testified that when he conducted the traffic stop, he asked Pendleton for his license and registration, but Pendleton could not produce the vehicle's registration. Pendleton then began making rapid movements inside the vehicle, moving both his hands and body while searching the vehicle's console and glove compartment.

Further, Detective Reed had conveyed to Officer Wallsmith that Pendleton was involved with an ongoing narcotics transaction. Officer Wallsmith testified that "[w]hen I do receive information of involvement in drugs I am concerned about weapons, so I had him exit the vehicle." (Tr. at 215.) This, taken together with Pendleton's rapid searching of the SUV's console and glove compartment, could lead a reasonable person to conclude that Pendleton could have been looking for a weapon in the vehicle. Under the totality of the circumstances, we cannot conclude that Officer Wallsmith's pat-down search of Pendleton

14

was an unreasonable search and accordingly find no abuse of discretion in the trial court's admission of the related evidence.

*Search of Pendleton's Pocket*

We turn now to Pendleton's contention that the trial court abused its discretion when it denied his objections to the admission of evidence obtained from Officer Wallsmith's search of Pendleton's pocket. Pendleton contends that he did not properly consent to the search of his pocket, during which Officer Wallsmith withdrew five $20 bills, because Officer Wallsmith did not provide him with an advisement of his right to have counsel present as required under Pirtle v. State, 263 Ind. 16, 323 N.E.2d 634 (1975).

In Pirtle, our supreme court held that where an individual is held in police custody and is asked to give consent to a search, he "is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." Id. at 29, 323 N.E.2d at 640. Pendleton does not dispute that he gave consent to the search of his pocket, and Officer Wallsmith testified that he did not advise Pendleton of his right under Pirtle to advice of counsel before giving consent to a search. Thus, our inquiry centers on whether he was in custody of the type required in Pirtle and its progeny. See, e.g., Meredith v. State, 906 N.E.2d 867, 873 (Ind. 2009).

In determining whether Pendleton was in custody such that Pirtle applies, "the 'ultimate inquiry' is whether there was a 'formal arrest' or a '"restraint on freedom of movement" of the degree associated with a formal arrest.'" Id. (quoting Luna v. State, 788 N.E.2d 832, 833 (Ind. 2003)). Courts "'largely apply an objective test asking whether a

15

reasonable person under the same circumstances would believe that she was under arrest or not free to resist the entreaties of the police.'" Id. (quoting Jones v. State, 655 N.E.2d 49, 55 (Ind. 1995)). Courts frequently consider as a factor in this determination whether a reasonable person in the defendant's position would feel free to leave. Id. However, where, as here, a defendant is subject to a traffic stop and is "'seized' and momentarily not free to go," the defendant is ordinarily not considered in custody. Id.

Pirtle and its progeny "police the line between ordinary investigative detentions and full-blown custodial interrogations." Id. Thus, we must determine whether the circumstances under which the defendant granted consent to the search included "objectively overpowering, coercive, or restraining police behavior, such that the facts demonstrate 'a degree associated with a formal arrest.'" Id. at 873-74 (quoting Melton v. State, 705 N.E.2d 564, 566 (Ind. Ct. App. 1999)). Prior cases have turned on whether a defendant was read Miranda rights, how vigorous law enforcement interrogation was, whether police suggested a defendant should or must cooperate, and the length of time during which the defendant was detained. Id. at 874 (citing Clarke v. State, 868 N.E.2d 1114 (Ind. 2007); Sellmer v. State, 842 N.E.2d 358 (Ind. 2006); Cooley v. State, 682 N.E.2d 1277 (Ind. 1997); Torres v. State, 673 N.E.2d 472 (Ind. 1996)).

Here, we cannot conclude that Officer Wallsmith's request for consent to search Pendleton's pocket rose to the level of coercion or restraint required to entitle Pendleton to advice of counsel prior to giving consent to a search under Pirtle. There is no contention that the duration of Pendleton's detention was any greater than the length of an ordinary traffic

16

stop. While Officer Wallsmith inquired about the source of the money in Pendleton's pocket, there is no testimony that Officer Wallsmith asked for consent to a search beyond permission to reach into a single pocket—and this after Officer Wallsmith had already correctly determined that what he felt in Pendleton's pocket was, in fact, money. Nor is there any contention that Officer Wallsmith asked repeatedly, attempted to coerce, or otherwise indicated to Pendleton that Pendleton's cooperation was necessary to end the traffic stop.

Absent circumstances indicative of coercion in obtaining Pendleton's consent to the search of his pocket, we cannot conclude that the trial court abused its discretion when it admitted into evidence the serial numbers of the $20 bills in Pendleton's pocket and any related testimony. We therefore affirm the trial court's evidentiary rulings on these matters.

### Denial of Motion for Directed Verdict

We turn now to Pendleton's final contention on appeal, namely, that the trial court erred when it denied his motion for a directed verdict, properly called a motion for judgment on the evidence, on the second count in the charging information related to the events of April 6, 2011.

We apply the same appellate standard of review to motions for judgment on the evidence as we do when the sufficiency of the evidence is challenged on appeal. Dye v. State, 943 N.E.2d 928, 930 (Ind. Ct. App. 2011). That standard of review is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence. Id. We will affirm the conviction unless "'no reasonable fact-finder could

17

find the elements of the crime proven beyond a reasonable doubt.'" Id. (quoting Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000)).  "'The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.'"  Id. (quoting Pickens v. State, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

Here, Pendleton challenges the sufficiency of the evidence to support one of the two convictions for Conspiracy to Commit Dealing in Cocaine, as a Class B felony.  To convict Pendleton as charged, the State was required to prove beyond a reasonable doubt that he agreed with another person to commit Dealing in Cocaine as defined in Indiana Code section 35-48-4-1, and that either he or the other person—here, either Tonya or Jeffrey Durham—performed an overt act in furtherance of the agreement.  I.C. § 35-41-5-2(a).  Indiana Code section 35-48-4-1 provides:

A person who:

> (1) knowingly or intentionally:
>
>> (A) manufactures;
>>
>> (B) finances the manufacture of;
>>
>> (C) delivers; or
>>
>> (D) finances the delivery of;
>
> cocaine or a narcotic drug, pure or adulterated, classified in schedule I or II; or
>
> (2) possesses, with intent to:
>
>> (A) manufacture;
>>
>> (B) finance the manufacture of;

18

> (C) deliver; or
>
> (D) finance the delivery of;
>
>> cocaine or a narcotic drug, pure or adulterated, classified in schedule I or II;
>
> commits dealing in cocaine or a narcotic drug, a Class B felony, except as provided in subsection (b).

I.C. § 35-48-4-1(a).

> Pendleton argues:
>
> The evidence for Count 2 was that the CI went to a house to buy drugs from Jeffrey and Tonya. [The CI] gave $50.00 to Jeff. He left. He came back with drugs. She gave them a cut. Over Pendleton's objection exhibits were passed that did not relate to Pendleton. Pendleton's objections to speculation were overruled.[7]

(Appellant's Br. at 9.)

This is not, however, all the evidence that favors the verdict. Pendleton fails to note that Detective James Nielson ("Nielson") testified that when Jeffrey left the CI and Tonya at his residence on April 6, 2011 to retrieve the drugs, Jeffrey drove to 623 South Walnut—the address that Pendleton gave to Officer Wallsmith as his home address on April 7, 2011. Pendleton further fails to note that Jeffrey and Tonya indicated that on April 6, 2011, after placing a phone call to arrange for the acquisition of crack cocaine, they would obtain the drugs from someone they called "KP," which letters are the same as initials of Pendleton's first and last name. (Tr. at 116.)

This evidence, taken together with the other evidence of a sale of drugs arranged for the CI by the Durhams, permitted a reasonable fact finder to conclude beyond a reasonable

---

[7] Pendleton does not argue that the trial court's decisions overruling these objections were in error.

doubt that Pendleton had agreed with the Durhams to commit Dealing in Cocaine. We cannot conclude that there was insufficient evidence to support the jury's verdict on Count 2, nor that the trial court erred when it denied Pendleton's motion for judgment on the evidence. We therefore affirm the verdict.

## Conclusion

Pendleton was not prejudiced by the State's amendment of the charging information after the omnibus date. The trial court did not abuse its discretion when it admitted evidence obtained as a result of Officer Wallsmith's traffic stop, pat-down search of Pendleton, and search of Pendleton's pocket. There was sufficient evidence to support a jury verdict as to Count 2, and thus the trial court did not err when it denied Pendleton's motion for judgment on the evidence.

Affirmed.

VAIDIK, J., and BROWN, J., concur.