## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 17 2016, 6:59 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Richard Walker
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jerry Conn,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 17, 2016<br><br>Court of Appeals Case No.<br>48A02-1505-CR-311<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable David A. Happe, Judge<br><br>Trial Court Cause No.<br>48C04-1406-FB-1058 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Jerry Conn (Conn), appeals his convictions for dealing in methamphetamine, a Class B felony, Ind. Code § 35-48-4-1.1(a)(1)(A) (2014); possession of methamphetamine, a Class D felony, I.C. § 35-48-4-6.1(a) (2014); possession of chemical reagents or precursors with intent to manufacture a controlled substance, a Class D felony, I.C. § 35-48-4-14.5(e) (2014); and maintaining a common nuisance, a Class D felony, I.C. § 35-48-4-13(b)(2) (2014).

We affirm.

## ISSUES

Conn raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion when it admitted certain evidence found pursuant to Michelle Copeland's (Copeland) consent to search; and

(2) Whether the admission of the National Precursor Log Exchange (NPLEx) records violated Conn's right to confrontation.

## FACTS AND PROCEDURAL HISTORY

Copeland met Conn in September 2013. Copeland moved into Conn's residence in Anderson, Indiana later that year. Copeland did not have custody of her fifteen-year-old son, E.C., who lived with his father in Ohio, but E.C.

came to stay with Copeland at her parent's house shortly before she moved in with Conn and later accompanied Copeland when she moved in with Conn. Copeland began using methamphetamine with Conn, who manufactured it in his basement. Conn taught her how to make it and she started gathering methamphetamine ingredients, including pseudoephedrine. Although, Copeland and Conn made methamphetamine together, "[Conn] was the boss." (Transcript p. 664). E.C. became curious about the "really bad smell" coming from the basement. (Tr. pp. 769-71). Eventually, Conn started trusting E.C. and let him into the basement. Conn taught E.C. "how to manufacture methamphetamine" as well. (Tr. p. 771). E.C. helped Conn and his mother make methamphetamine two or three times per week. E.C. started using it and became addicted.

[5] In May 2014, E.C. returned to Ohio because he "was tired of it all." (Tr. p. 781). However, he came back to Indiana with his stepmother and her kids to visit his stepmother's parents in early June. E.C. called Copeland and Conn, and they "smoked a little bit of methamphetamine" together. (Tr. pp. 781-82). E.C. stayed at Conn's house one night and then walked to his aunt's house, who learned that he had been using methamphetamine. E.C.'s aunt informed his stepmother. After an argument with his stepmother, E.C. ran away. A deputy sheriff picked E.C. up about three miles from the aunt's house. E.C. told the officer that he "had suicidal thoughts," so the officer took him to a hospital. (Tr. pp. 785-86). At the hospital, E.C. talked to Tresha Huston

(Huston) of the Department of Child Services (DCS). He told her that he used methamphetamine and that Conn and his mother made it in their basement.

[6] On June 10, 2014, Madison County Drug Task Force Detectives Leann Dwiggins (Detective Dwiggins) and Jason Brizendine (Detective Brizendine) escorted Huston to Conn's residence for a welfare check. Expecting a visit from the police or DCS, Conn had tried to hide the evidence of his manufacturing operation. When the officers arrived, Conn was in the front yard. Detective Brizendine told Conn why they were there and asked if he could look around behind Conn's house. Conn agreed and "was very cooperative" with Detective Brizendine. (Tr. pp. 229-30). In Conn's outdoor grill, the officer found gloves and two bottles, which the officer recognized as a one-pot lab and an HCL generator used in methamphetamine manufacturing. Detective Brizendine then advised Conn of his rights, and Conn refused to consent to a further search.

[7] While Detective Brizendine was talking to Conn, Detective Dwiggins and Huston met Copeland at the front door. They explained why they were there, and Huston asked Copeland if it was okay to talk to her inside. Copeland let them in and "was cooperative" with them. (Tr. pp. 119-21). During Huston's interview, Copeland did not admit to E.C.'s allegations. When Huston finished the interview, Detective Dwiggins asked if she could search the basement, and Copeland agreed. In the basement, Detective Dwiggins discovered stripped lithium batteries and casings and other items, such as sulfuric acid, lye, a glass jar, vinyl tubing, hemostat scissors, and empty prescription bottles used in

methamphetamine manufacturing. Then, Detective Dwiggins advised Copeland of her rights.

[8] The officers obtained a warrant to search Conn's property, including the four vehicles sitting on his property. In the bedroom, they found a pill bottle that contained rubber gloves, a cellophane wrapper, and two receipts for "ingredients for methamphetamine and/or tools of the trade." (Tr. p. 418). In the kitchen, the officers found empty twenty-ounce plastic bottles, which are "use[d] to make the [one-pot] vessels and also the HCL generators," and Morton's Ice Cream Salt, which is used "to make an HCL generator." (Tr. pp. 423-27). In the garage, the officers found a pill bottle containing a plastic baggie of methamphetamine. In a garbage can in the driveway, the officers found empty pseudoephedrine boxes and "a light bulb … that can commonly be used as paraphernalia for smoking methamphetamine." (Tr. p. 564).

[9] An Information was filed on June 11, 2014, which the State amended on January 30 and February 9, 2015. The State ultimately charged Conn with Count I, dealing in methamphetamine, a Class B felony; Count II, possession of methamphetamine, a Class D felony; Count III, possession of chemical reagents or precursors with intent to manufacture a controlled substance, a Class D felony; and Count IV, maintaining a common nuisance, a Class D felony. On February 9, 2015, Conn filed a motion to suppress the evidence found on his property. On February 12, 2015, the trial court held a suppression hearing and, on April 13, 2015, denied Conn's motion. Following a three-day jury trial, Conn was found guilty as charged on April 23, 2015. On April 27,

2015, the trial court sentenced Conn to an aggregate sentence of seventeen years, with fifteen years executed at the Department of Correction and two years suspended to probation.

[10] Conn now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Consent to Search*

[11] Conn argues that the trial court erroneously denied his motion to suppress the evidence found pursuant to a warrantless entry into his residence. Because Conn appeals after a completed trial, we review the trial court's ruling for abuse of discretion. *Reinhart v. State*, 930 N.E.2d 42, 45 (Ind. Ct. App. 2010). *Id*. In our review, we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id*. We also defer to the trial court's factual determinations unless clearly erroneous. *Id.* However, we consider afresh any legal question of the constitutionality of a search or seizure. *Id.*

[12] Conn specifically claims that Copeland should have received the *Pirtle* warning because she was in custody when she consented to the search of their house. *See Pirtle v. State*, 323 N.E.2d 634 (Ind. 1975). Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Primus v. State,* 813 N.E.2d 370, 374 (Ind. Ct. App. 2004). When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.* Warrantless searches and

seizures inside the home are presumptively unreasonable. *Id*. However, one well-recognized exception to the warrant requirement is a voluntary and knowing consent to search. *Id*. The theory underlying the consent exception is that, when an individual gives the State permission to search either his person or property, the governmental intrusion is presumably reasonable. *Id.* Furthermore, in Indiana, a person held in police custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given. *Jones v. State*, 655 N.E.2d 49, 54 (Ind. 1995), *reh'g denied*. Whether consent to a search was given voluntarily is a question of fact to be determined from the totality of all the circumstances. *State v. Cunningham*, 26 N.E.3d 21, 25 (Ind. 2015) (internal quotation marks and citations omitted). We consider conflicting evidence most favorably to the trial court's ruling, as well as undisputed evidence favorable to the defendant. *Id*. It is the State's burden to prove that consent to a search was in fact voluntarily given, and not the result of duress or coercion, express or implied. *Id.*

[13] The State contends that Copeland was not in custody when she gave her consent to search and therefore the officers were not required to administer the *Pirtle* warning. We agree with the State. Custody is determined by an objective test: whether a reasonable person under the same circumstances would have believed that he was under arrest or not free to resist entreaties of the police. *West v. State*, 755 N.E.2d 173, 178-79 (Ind. 2001). Relevant circumstances include:

whether the defendant is read his *Miranda* rights or handcuffed or restrained in any way, and the manner in which the defendant is interrogated, whether a person freely and voluntarily accompanies police officers, at what point the defendant is arrested for the crime under investigation, the length of the detention, and the police officer's perception as to the defendant's freedom to leave at any time.

*Id.* at 179 (internal citations omitted).

[14]     Here, our review of the record reveals that Copeland consented to a search twice, first when she let Huston and the police officers inside the residence, and then when she allowed Detective Dwiggins to look in her basement. Copeland testified that she and Conn knew DCS and the police were coming, so Conn tried to hide the evidence of methamphetamine manufacturing. When Copeland answered her door, the officers and Huston explained why they were there, and Copeland said they could talk inside. Huston testified that if Copeland had told her she could not come inside, she would have left. The police officers did not handcuff Copeland or restrain Copeland's movements otherwise. Huston interviewed Copeland on her couch. Huston testified that she was not "able to substantiate any of the allegations [of the methamphetamine manufacturing in their house] that were made" during her interview with Copeland. (Tr. pp. 121-22). During this time, Copeland never asked Huston or the police officers to leave. When Huston finished her interview, Detective Dwiggins asked Copeland if she could look in the basement because "that was where the allegations were made that the manufacturing [took place]." (Tr. p. 146). Copeland agreed. Detective

Dwiggins testified that, after she found the evidence in the basement, she "asked permission to search the house and advised [Copeland] of her *Pirtle* and her rights." (Tr. p. 410). Then, the officers obtained a search warrant and arrested Conn and Copeland based on the evidence they had found.

[15] Conn cites to *State v. Linck*, 708 N.E.2d 60 (Ind. Ct. App. 1999), *trans. vacated*. In *Linck*, two police officers were dispatched to Linck's apartment to investigate a complaint of illegal drug use. *Id*. at 61. Outside the apartment, the officers smelled what they believed to be marijuana burning. *Id*. Linck allowed the officers inside and stated he had "just smoked a joint." *Id*. One of the officers asked if there was anything left; Linck retrieved a bag of marijuana from the refrigerator and said there was more in his bedroom. *Id*. On appeal, Linck argued that he was in custody and should have received *Miranda* warnings. *Id*. at 62-63. The *Linck* court found that Linck was in custody for purposes of *Miranda* warning after he admitted smoking the marijuana. *Id*. at 63. "By informing the officers that he had just smoked the marijuana, Linck admitted to engaging in illegal activity, confirming the officers' suspicions and the original complaint. Further, immediately before Linck made this admission, the officers had smelled burning marijuana both in the hallway and in Linck's apartment." *Id*.

[16] Unlike the defendant in *Linck*, Copeland did not make any admissions pointing to any guilt on her or Conn's part before the search. The officers' suspicions and E.C.'s allegations were not confirmed until after Copeland consented to a search of the basement. Therefore, because Copeland was not in custody when

she gave her consent to the search, we hold that *Pirtle* does not apply. Furthermore, our review of the record indicates that Copeland gave her consent voluntarily. Although Copeland did not admit to E.C.'s allegations at first, she was very cooperative with Hudson and the police officers. Copeland was calm, never yelled at the officers, and never indicated that she wanted the officers to leave. She was neither threatened nor restrained. When asked for permission to look in the basement, Copeland, unlike Conn outside of the house, easily agreed. As such, we find that Copeland gave a valid consent to search the basement.

## II. *NPLEx Records*

Conn further asserts that the trial court's admission of the NPLEx records[1] showing the pseudoephedrine purchases Conn and Copeland made between December 2013 and June 2014 violated his right to confrontation. The Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause prohibits the admission of an out-of-court statement if it is testimonial, the

---

[1] Indiana code section 35-48-4-14.7 sets forth certain requirements that a retailer must meet if the retailer sells ephedrine or pseudoephedrine. One of these requirements is that the retailer must maintain records of all sales of a nonprescription product containing ephedrine or pseudoephedrine. The records must include identification information of each purchaser. The retailer must submit these records to the NPLEx. The retailer may not complete the sale if the system generates a stop sale alert. *See* I.C. § 35–48–4–14.7.

declarant is unavailable, and the defendant had no prior opportunity to cross-examine the witness. *Crawford v. Washington,* 541 U.S. 36, 59 (2004). However, "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 324 (2009). The NPLEx records qualify as business records under Indiana Evidence Rule 803(6). *Montgomery v. State*, 22 N.E.2d 768, 775 (Ind. Ct. App. 2014), *trans. vacated*, (citing *Embrey v. State*, 989 N.E.2d 1260, 1267 (Ind. Ct. App. 2013)).

[18] In *Montgomery*, the defendant argued that the trial court's admission of the NPLEx records violated his right to confrontation. *Montgomery*, 22 N.E.2d at 774. The *Montgomery* court examined the statutory requirements for ephedrine and pseudoephedrine purchases under Indiana Code section 35-48-4-14.7 and concluded that the main purpose of the NPLEx records was to enable the National Association of Drug Diversion Investigators to track and regulate the sale of non-prescription ephedrine and pseudoephedrine. *Id*. at 775. As such, the main purpose of the NPLEx records was not to establish or prove some fact at trial. *Id*. The *Montgomery* court then held that "in light of the United States Supreme Court's holding in *Melendez-Diaz*, … the records are not testimonial and … the admission of NPLEx records at trial [does not] violate [the defendant's] rights under the Confrontation Clause." *Id*. Here, Conn makes the same argument as the defendant in *Montgomery*. Because we have

previously determined that the NPLEx records are admissible under the business records exception to the hearsay rule in Indiana, we hold that the trial court did not abuse its discretion when it admitted the NPLEx records and such admission did not violate Conn's right to confrontation. *See Embrey*, 989 N.E.2d at 1267.

## CONCLUSION

Based on the foregoing, we hold that the trial court did not abuse its discretion when it admitted the evidence found pursuant to a valid consent to search and a valid search warrant and that the admission of the NPLEx records did not violate Conn's right to confrontation.

Affirmed.

Najam, J. and May, J. concur