ATTORNEY FOR APPELLANT
Michael E. Caudill
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

---

# In the
# Indiana Supreme Court

No. 49S05-0612-CR-496

MARK CLARKE,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49G20-0409-FA-169079
The Honorable William Young, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 49A05-0508-CR-435

**June 26, 2007**

**Boehm, J.**

We hold that a police officer who neither explicitly nor implicitly communicates that a person is not free to go about his or her business may ask questions of the person to investigate allegations of criminal activity without implicating the Fourth Amendment or requiring the advisement of rights under the Indiana Constitution.

## Facts and Procedural Background

On September 16, 2004, Officer Tanya Eastwood of the Indianapolis Police Department was dispatched to 3736 North Meridian Street to investigate an anonymous report that "there was a black car with nice rims in front of the apartment building selling drugs." She arrived at the scene and found a black 1995 Nissan Maxima parked in front of the apartment building with two occupants. Eastwood activated her flashers and placed her spotlight so she could see Mark Clarke in the driver seat and Joshua Taylor in the back seat on the passenger side. When Eastwood approached the driver's side on foot, Clarke had his license and registration "hanging out the window."

Eastwood asked Clarke what he and Taylor were doing and how long they had been parked in front of the apartment. Clarke responded that they had been there about five minutes and that "he was dropping a passenger off at an apartment building down the street" approximately one-half block from their current location. Eastwood obtained Taylor's identification and returned to her car to run driver's license and warrant checks on both Clarke and Taylor. After discovering no outstanding warrants for either, Eastwood returned the information. She then told Clarke that she had received a "report of narcotics activity" and asked Clarke if there was anything illegal in the car. When Clarke said "there was not," Eastwood asked Clarke "if he cared if [she] searched his car," and Clarke responded, "I don't have anything in the car." According to Eastwood, she then asked Clarke "Do you mind if I search it?" and Clarke responded, "No," and "voluntarily opened his door and got out of the car on his own." Eastwood testified that Clarke left his car door open and that his body language indicated that she had permission to search the car. By this time, a second officer, Townsend, had arrived and "watched" Clarke and Taylor on the sidewalk while Eastwood conducted the search. Neither Clarke nor Taylor was physically restrained.

Eastwood found "a large amount of money, divided into several different bundles, divided by denominations" in the center console of the Nissan. She then requested a narcotics canine and was told that Park Ranger K9-1 Officer Phillip Greene would be at the scene within two minutes. In the meantime, Eastwood continued searching the car and "immediately" located a sandwich baggie containing marijuana. Eastwood asked Clarke why he consented to the search

if it contained marijuana, and Clarke responded that he "forgot it was in there." Eastwood then placed Clarke under arrest.

Officer Greene and his dog arrived at the scene, and the dog promptly indicated that narcotics were in the vehicle. Officer Greene then located a partially smoked marijuana cigarette and a baggie containing five individually wrapped baggies that the officers suspected contained over three grams of cocaine. Eastwood then Mirandized Clarke and Taylor.

After Taylor denied any knowledge of the drugs in the car or any involvement in drug dealing, Eastwood asked Clarke if there was anything else in the car. Clarke said "no," and Eastwood asked him if he wanted to talk with a detective "to help himself out." Clarke responded, "No. It's all over for me now anyway." While waiting for a police wagon, Clarke attempted to flee and was apprehended a few blocks away after a chase on foot.

The State charged Clarke with dealing in cocaine, possession of cocaine, misdemeanor possession of marijuana, and misdemeanor resisting law enforcement. Clarke moved to suppress the evidence seized from his vehicle. Clarke contended that the seizure violated his rights under the Fourth Amendment and Article I, section 11 of the Indiana Constitution. Both constitutions protect citizens against unreasonable searches and seizures of their "effects." Automobiles are protected effects under both provisions. Brown v. State, 653 N.E.2d 77, 79 (Ind. 1995). Clarke argued that Eastwood made an investigatory stop without reasonable suspicion in violation of the Fourth Amendment and that he was not advised of his rights before being asked to consent to the search of his car as the Indiana Constitution requires. The State responded that Clarke voluntarily consented to the search of his car and that he was not in police custody, so the seizure complied with both constitutions. After a hearing, the trial court found that there was no stop because the car was parked when Eastwood arrived and that consent was given to search the car. The trial court therefore denied the motion to suppress but granted Clarke's request to certify the order for interlocutory appeal. The Court of Appeals reversed, concluding the search violated Clarke's rights under the Fourth Amendment. Clarke v. State, 854 N.E.2d 423, 432 (Ind. Ct. App. 2006). We granted transfer. Clarke v. State, 860 N.E.2d 599 (Ind. 2006).

## I. The Fourth Amendment Claim

Terry v. Ohio, 392 U.S. 1 (1968) established that a law enforcement officer must have reasonable suspicion of criminal conduct in order to justify a traffic stop, which is a "seizure" for purposes of the Fourth Amendment. An anonymous tip containing no information beyond that available to the general public does not afford reasonable suspicion. Alabama v. White, 496 U.S. 325, 329-30 (1990); Jaggers v. State, 687 N.E.2d 180, 182-83 (Ind. 1997). Eastwood responded to an anonymous tip alleging narcotics activity but reporting no facts beyond a description of the vehicle. The issue, therefore, is whether a seizure occurred before Officer Eastwood gained additional information sufficient to establish reasonable suspicion. As Terry explained, "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 20 n.16. It is clear that "mere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434 (1991); see also Florida v. Royer, 460 U.S. 491, 497 (1983); Terry, 392 U.S. at 19; Sellmer v. State, 842 N.E.2d 358, 362 (Ind. 2006). The Fourth Amendment is not triggered unless an encounter between a law enforcement officer and a citizen "loses its consensual nature." Bostick, 501 U.S. at 434. The encounter is consensual and reasonable suspicion is not required if a reasonable person would feel free to "disregard the police and go about his business." Id. (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).

The Court of Appeals concluded that the initial encounter between Clarke and Eastwood was consensual up to the point at which Eastwood returned Clarke's license and registration. The Court of Appeals concluded, however, that the encounter escalated into a seizure based on four facts: (1) Clarke was not affirmatively told he was free to leave; (2) Eastwood asked an "incriminating question"—whether Clarke had anything illegal in his vehicle—which Clarke denied; (3) Eastwood asked to search the car, and Clarke again responded he had nothing illegal; and (4) Eastwood asked if Clarke "minded" if she searched, and Clarke gave an "ambiguous" response of "no." Clarke, 854 N.E.2d at 429-30.

As Bostick explained, summarizing earlier decisions,

> even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's

4

identification; and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required.

501 U.S. at 434-35 (citing INS v. Delgado, 466 U.S. 210, 216 (1984); Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984); Royer, 460 U.S. at 501; United States v. Mendenhall, 446 U.S. 544, 557-58 (1980)).

The meaning of Clarke's response of "no" to whether he would "mind" if his car was searched is for the trial court to resolve. Bostick, 501 U.S. at 432. Clarke may have misunderstood the question, but, as phrased, a negative answer is a consent to the search. Moreover, Eastwood testified that Clarke's "body language" conveyed a consent, and Clarke made no effort to change his response. Eastwood therefore reasonably accepted Clarke's response as a consent, and the trial court's finding that consent was given is not clearly erroneous and is dispositive of that issue. Under Bostick, the Fourth Amendment permits consensual interrogation "as long as the police do not convey a message that compliance with the requests is required." 501 U.S. at 434-35. There is no evidence that Eastwood conveyed that message. Her mere presence as a uniformed law enforcement officer does not convert her questions into commands. Id. Accordingly, there was no seizure before Clarke gave consent to the search, and the search established probable cause to arrest Clarke. This process did not violate the Fourth Amendment.

## II. Indiana Constitutional Claim

There is no federal constitutional right to counsel before consenting to a search even if the suspect is in custody. United States v. Lagrone, 43 F.3d 332, 337 (7th Cir. 1994). However, Pirtle v. State, 263 Ind. 16, 323 N.E.2d 634 (1975) established that Article I, section 11 of the Indiana Constitution requires that a person in custody explicitly waive the right to counsel before giving a valid consent to a search.

Clarke was not advised of his right to counsel before Eastwood asked for consent to the search of Clarke's car. If Clarke was in custody, his rights under Pirtle were violated, and the motion to suppress must be granted. However, a suspect who has been stopped and therefore has been "seized" for purposes of Article I, section 11 is not necessarily in custody. Cooley v. State, 682 N.E.2d 1277, 1279 (Ind. 1997). In Jones v. State, 655 N.E.2d 49 (Ind. 1995), we explained the difference between an investigatory stop and police custody. In that case, South Bend police

5

received two anonymous tips that Jones was carrying crack cocaine in the gas cap compartment of his car. Id. at 52. Jones's vehicle was identified outside a nightclub and three unmarked police cars and one marked car followed Jones as he left the club. Id. Jones stopped in the middle of the street to unload a passenger, and Captain Fautz turned on his police lights and stoplight and stopped Jones to cite him for obstructing traffic. Id. As Fautz approached Jones's car, the other officers exited their vehicles. Id. at 52-53. Fautz asked Jones if he could search Jones's car but told Jones "he had the right to refuse." Id. at 53. Jones responded with "Go ahead," and Fautz obtained a "permit to search form" from his car, returned to Jones, handed him a copy, and read the form to him. Id. As he read the form, another officer opened the gas compartment and discovered baggies of crack inside. Id. Fautz completed reading the first part of the form, which contained the Miranda rights, and asked Jones if he understood it. Id. When Jones indicated that he did, Fautz read the second portion of the form, which covered vehicle searches. Jones then indicated that he did not want his car to be searched. As Fautz turned to inform the other officers of Jones's decision, the officer who had found the crack said, "It's too late, I've already found it." Id.

Relying primarily on Pirtle, we affirmed the denial of Jones's motion to suppress. Although Jones had been stopped, and therefore seized, he had been advised that he could refuse consent to a search and had been told he was stopped for a traffic violation, not a drug investigation. Id. at 56. He "was neither arrested nor in police custody." Id. As a result, his Pirtle rights had not attached. Id. Similarly, at the time Clarke's consent was given, he had not been "seized," much less placed in custody. Accordingly, his Pirtle rights were not violated. See also Peterson v. State, 514 N.E.2d 265 (Ind. 1987) (holding that the defendants' consent was a valid waiver of Fourth Amendment rights because they were not in custody); Huspon v. State, 545 N.E.2d 1078 (Ind. 1989) (same).

Sellmer v. State, 842 N.E.2d 358 (Ind. 2006), is consistent with our holding today. In that case we concluded that a reasonable person in Sellmer's circumstances would believe either that she was under arrest or, at least, that she was not free to resist the entreaties of the police. 842 N.E.2d at 364. As a result, her consent without a Pirtle advisement violated the Indiana Constitution. That conclusion rested on six factors, most of which are absent in Clarke's case. An anonymous tip described Sellmer's automobile and alleged that the car was parked in front of a hair salon and contained a large amount of drugs. Id. at 359. Two Noblesville police officers

6

arrived and found a vehicle matching the informant's description. They saw Sellmer and another woman leave the car and go into the salon. Id. at 360. The officers entered the salon and asked Sellmer if she owned the car parked outside. Id. Sellmer answered affirmatively, and the officers asked her to step outside. Id.

The arresting officer, Roberts, "asked Sellmer for permission to search her car between three and five times before securing her consent." Id. at 364. Roberts repeatedly asked incriminating questions. Id. After informing Sellmer that he had received information regarding illegal drug activity, Roberts asked her if there were drugs in her car. When Sellmer did not respond, the officer told her, "It's in your best interest to cooperate with us and not make us jump through a bunch of hoops." Id. He then told her, "If you have nothing to hide here, and the information we have been given is not true, I'm going to thank you for your time and allow you to go on your way." Id. Sellmer asked Roberts "what her options or what rights she had and what rights the police had." Id. at 365. The officer did not tell Sellmer that she had the right to refuse consent. Finally, Sellmer specifically asked, "Do I have to let you search my car?" Id. Roberts responded, "It would be in your best interest to cooperate if you have nothing to hide." Id. Importantly, Sellmer was told she would be "allowed" to go if nothing was found. The officers thus implied that she was under restraint and refused to give her an answer to her direct inquiry whether this was the case.

Clarke was presented with no such implication or refusal. Clarke's encounter with Eastwood involved neither suggestions that he should cooperate, nor the implication of adverse consequences for noncooperation, nor any suggestion that he was not free to go about his business. Eastwood informed Clarke of the "report of narcotics activity," but this was not as direct an accusation as the questions asked of Sellmer. Although Clarke was twice asked whether Eastwood could search his car, Eastwood's second inquiry was a response to Clarke's initial answer "I don't have anything in the car." This did not answer Eastwood's question whether she was permitted to search the car. It thus presents the reverse situation from Sellmer where the officer avoided responding to the suspect's direct question before seeking consent to search. In sum, Eastwood remained within the confines established by Bostick and had not seized Clarke, much less placed him in custody. Accordingly, there was no Pirtle violation.

7

## Conclusion

We affirm the trial court's denial of Clarke's motion to suppress. We summarily affirm the Court of Appeals as to issues not addressed in this opinion. <u>See</u> Appellate Rule 58(A).

Shepard, C.J., and Dickson and Sullivan, JJ., concur.

Rucker, J., dissents with separate opinion.

**Rucker, Justice, dissenting.**

Like the Fourth Amendment to the United States Constitution, the purpose of Article 1, Section 11 of the Indiana Constitution is not to eliminate all contact between the police and the citizenry but rather "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)). Thus a consensual encounter between a law enforcement officer and an Indiana citizen – in which the officer makes a casual and brief inquiry – does not implicate Article 1, Section 11. In essence there is no "seizure" within the meaning of the Indiana Constitution "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away." Mendenhall, 466 U.S. at 554; Johnson v. State, 856 N.E.2d 706, 713 (Ind. Ct. App. 2005) (concluding that police intrusion cannot withstand scrutiny under Article 1, Section 11 of the Indiana Constitution when an individual no longer remains free to leave the officer's presence and there is no indication of reasonable suspicion of any criminal activity afoot); see also Brendlin v. California, 127 S.Ct. 2400, 2406 (2007) (affirming Mendenhall's free-to-leave test for federal analysis).

In this case the majority concludes no seizure occurred based upon the officer's interpretation of Clarke's body language and that Clarke made no attempt to change his negative answer to the question of whether he would "mind" if his car was searched. I am of the view that this observation sheds no light on the question of whether Clarke was seized within the meaning of Article 1, Section 11. "To the extent that there is anything ambiguous in the show of force . . . , the [free-to-leave] test resolves the ambiguity" by utilizing the objective test of what a reasonable person would understand as a display of authority. Brendlin, 127 S.Ct. at 2408.

The record shows Officer Eastwood responded to an anonymous tip of a "black car with nice rims" parked in front of an apartment building from which someone was selling narcotics. Tr. at 4. Upon arrival at the apartment building, Officer Eastwood pulled in behind Clarke's vehicle, activated the rear flashers and placed the spotlight on the vehicle so she could see what was inside the parked vehicle before approaching. Tr. at 5. Officer Eastwood asked for identification and if there was anything illegal in the car before running Clarke's and the

passenger's information through the computer. App. at 87. Both answered "no." Id. After having found no problems and returning to Clarke his license and registration, Officer Eastwood did not inform Clarke he was free to leave, nor did she cite him for an infraction or other violation of the law. Instead Officer Eastwood informed Clarke she was investigating a report of narcotics activity and asked again if there was anything illegal in the car. Tr. at 8. Clarke responded "no." Id. Clarke was then asked whether he cared if she searched his car. He did not answer the request but again responded that he did not have anything illegal in the car. Id. at 8-9.

At this point I am convinced that no Hoosier could reasonably assume that he or she could simply walk away. See, e.g., United States v. Drayton, 536 U.S. 194, 212 (2002) (Souter, J., dissenting) (A later request to search prefaced with "Do you mind . . ." after having been told by officers that they were conducting a bus interdiction would naturally have been understood by citizens in the terms with which the encounter began. No reasonable passenger could believe "that he stood to lose nothing if he refused to cooperate with the police, or that he had any free choice to ignore the police altogether."); Combs v. State, 851 N.E.2d 1053, 1059 (Ind. Ct. App. 2006) (finding a reasonable person having pulled over his vehicle without any prompting by the officer would not have felt free to leave after the officer indicated he was investigating a report of a suspicious vehicle and asked the driver for identifying information). In essence, immediately before Clarke gave his equivocal response to the question of whether he would "mind" if the officer searched his car, he had been seized within the meaning of Article 1, Section 11. This is so because neither he nor any other Indiana citizen in his circumstance could have felt free to disregard the officer's questions and leave the scene. And because the officers lacked reasonable suspicion to seize Clarke, their subsequent search of his car without a warrant was constitutionally infirm unless there was an exception to the warrant requirement.

The State contends there was such an exception, namely consent to search. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (stating it is well-settled that a consent to search is an established exception to the warrant and probable cause requirement); Perry v. State, 638 N.E.2d 1236, 1240 (Ind. 1994) ("[A] valid consent to search obviates the warrant requirement."). It is of course the case that even under circumstances of a routine traffic stop, the Indiana Constitution does not prohibit a police officer at the conclusion of the stop, without

2

any independent reasonable suspicion of illegal activity, from seeking consent to search the car. See Callahan v. State, 719 N.E.2d 430, 439 (Ind. Ct. App. 1999). The same is true here even though, as the trial court noted, there was no traffic stop because Clarke's car was already parked when officers arrived on the scene. The underlying rationale for this rule is that where an individual gives permission to search either his person or property, the governmental intrusion is deemed presumably reasonable. Jones v. State, 655 N.E.2d 49, 54 (Ind. 1995).

But we have held that under the Indiana Constitution "a person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." Pirtle v. State, 263 Ind. 16, 323 N.E.2d 634, 640 (1975); see also Sims v. State, 274 Ind. 495, 413 N.E.2d 556, 559 (1980) (A person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given.). To determine whether a defendant is in custody "we apply an objective test asking whether a reasonable person under the same circumstances would believe themself to be under arrest *or not free to resist the entreaties of the police*." Torres v. State, 673 N.E.2d 472, 474 (Ind. 1996) (emphasis added, quotation omitted). Stated somewhat differently, a person is not in custody where he or she is "unrestrained and ha[s] no reason to believe he [or she] could not leave." Huspon v. State, 545 N.E.2d 1078, 1081 (Ind. 1989).

In this case the majority distinguishes between "custody" and "seizure" concluding that "Pirtle advisements" are required for the former, but not the latter. I see no principled distinction between the two. By whatever nomenclature, the key question to be asked is whether the person is entitled to disregard police questioning and walk away. If not, then the person must be informed of the right to consult with counsel about the possibility of consenting to a search. Otherwise no valid consent can be given. Indeed the primary authority on which the majority relies makes this very point. Discussing Jones, 655 N.E.2d at 56, the Court in Cooley v. State, 682 N.E.2d 1277, 1279 (Ind. 1997), recognized, "Had Jones refused to give the police permission to search, he would have been given two citations and been free to leave." In this case Clarke had no such option. And because he was not given a Pirtle advisement any alleged

3

consent was invalid as a matter of state law.  Accordingly, I agree with the result reached by the Court of Appeals and would reverse the trial court's denial of Clarke's motion to suppress.