

FILED

Dec 23 2013, 5:42 am

CLERK
of the supreme court,
court of appeals and
tax court

# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**BRYAN L. COOK**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DUANE JADRICH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 32A04-1302-CR-67 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Mark A. Smith, Judge
Cause No. 32D04-1108-FD-684

**DECEMBER 23, 2013**

**OPINION – FOR PUBLICATION**

**BRADFORD, Judge**

Hendricks County Sherriff's Deputy Robert Butterfield, who was attempting to serve a protective order, knocked on the front door of a residence on State Road 267. When he received no response, Deputy Butterfield walked to the rear of the house, passing by signs indicating that visitors were only to use the front door and through the closed gate of a chain-link fence. Deputy Butterfield knocked on the back door and again received no response but, when he took two steps off of the back patio, he noticed a "grow" inside a circle of firewood and brush. Deputy Butterfield approached and observed what he believed to marijuana in the circle and called Sherriff's Sergeant Brett Clark.

Sergeant Clark arrived with Sherriff's Detectives Henry Sadler and Matthew Wing. Detective Sadler knocked on the front door, received no response, but noticed an open window on the front of the house. When Detective Sadler knocked on the window, an individual inside asked who it was. Appellant-Defendant Duane Jadrich and his wife opened the front door, and Detective Sadler advised Jadrich that he wanted to speak with him about the marijuana plants in the back yard. Eventually, Jadrich consented to a search of his residence, which uncovered a smoking pipe containing marijuana residue. Six plants recovered from the back yard tested positive for marijuana.

The State charged Jadrich with Class D felony marijuana possession and Class A misdemeanor paraphernalia possession. Jadrich filed a motion to suppress the evidence

---

[1] We heard oral argument in this case on November 19, 2013, at Lawrence North High School in Indianapolis. We wish to extend our gratitude for the hospitality of the students, staff, and faculty of Lawrence North and commend counsel for the high quality of their oral advocacy.

found at his residence. After trial on only a stipulation of facts with Appellee-Plaintiff the State of Indiana, the trial court found Jadrich guilty as charged, entered judgment of conviction for Class A misdemeanor marijuana possession and Class A misdemeanor paraphernalia possession, and sentenced Jadrich to 365 days of incarceration with 363 days suspended to probation. Jadrich contends that Deputy Butterfield conducted an unconstitutional warrantless search of his property; that his consent to the search of his home was invalid; and that police improperly sought his consent to search his home without advising him that he had the right to consult with counsel, pursuant to *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975).[2] Concluding that Deputy Butterfield's search violated the Fourth Amendment to the United States Constitution, we reverse and remand with instructions.

## FACTS AND PROCEDURAL HISTORY[3]

In the early morning hours of August 7, 2011, which was a Sunday, Deputy Butterfield attempted to serve a protective order[4] at 8055 North State Road 267 in

---

[2] "*Pirtle v. State* … established that Article I, section 11 of the Indiana Constitution requires that a person in custody explicitly waive the right to counsel before giving a valid consent to a search." *Clarke v. State*, 868 N.E.2d 1114, 1119 (Ind. 2007).

[3] Although there was a pretrial suppression hearing, the parties' "Revised Stipulated Facts" constitute the entirety of the record on which Jadrich was convicted. Moreover, there is no indication that either party incorporated the suppression record into the trial record. Both Jadrich and the State, however, rely on evidence collected at the suppression hearing in generating their fact patterns and supporting their arguments. For example, Jadrich argues that the protective order Deputy Butterfield was attempting to serve was stale, an argument based on evidence from the suppression record that the person named in the protective order no longer lived with Jadrich and that Jadrich had previously notified the sheriff's department of that fact. Neither party has filed a motion to strike or otherwise objected to the other's use of evidence from the suppression hearing. Under the circumstances, we shall treat the suppression record as effectively incorporated into the trial record.

Brownsburg. A tree along the driveway to the property bore a sign that read, "please use front door only!!!" Appellant's App. p. 20. Deputy Butterfield approached the front door and knocked several times with no response. Deputy Butterfield then walked to the back of the residence. A garage door near the backyard area bore a sign that read, "no trespassing[.]" Appellant's App. p. 20. In order to reach the back door, Deputy Butterfield had to pass through the closed gate of a chain-link fence, which gate bore signs that read "no trespassing" and "please use front door only[.]" Appellant's App. p. 19. A paved sidewalk led from the fence gate to a back patio, which afforded access to the back door.

On his way to the back door, Deputy Butterfield noticed a circular pile of firewood in the back yard that "seemed a little strange." Appellant's App. p. 20. Deputy Butterfield knocked on the back door several times, again receiving no response. As he was leaving, Deputy Butterfield noticed a stack of brush leading from the firewood circle and, when he took two steps off of the back patio, could see a "grow" inside the circle. Appellant's App. p. 20. Deputy Butterfield approached the circle and observed that it contained marijuana plants. Deputy Butterfield called his supervisor, Sergeant Clark.

Sergeant Clark arrived at the residence with Detectives Sadler and Wing. Detective Sadler knocked on the front door and announced himself but received no response. Detective Sadler noticed an open window to the left of the front door, knocked on the window, and

---

[4] Although the stipulated facts on which Jadrich's convictions are based indicate only that Deputy Butterworth was attempting to serve a "no contact order/protection order[,]" Appellant's App. p. 20, the record also indicates that the order was a "civil paper[.]" State's Ex. Deposition of Brett Clark p. 4. Consequently, we infer that Deputy Butterfield was attempting to serve a civil protective order obtained pursuant to the Indiana Civil Protection Order Act. *See* Ind. Code ch. 34-26-5.

4

again announced himself. An individual responded, "who is it?", and Jadrich and his wife, the owners of the residence, opened the front door. Appellant's App. p. 21. Detective Sadler told Jadrich that he wished to speak with him about the marijuana plants in the backyard. Jadrich invited Detective Sadler and the other officers into his residence. Jadrich consented to a search of his home, which uncovered a smoking pipe with marijuana residue found on an ottoman in the back living room. The plants from the circle were tested and found to be marijuana with a total weight of 188.9 grams.

On August 9, 2011, the State charged Jadrich with Class D felony marijuana possession and Class A misdemeanor paraphernalia possession. On February 29, 2012, Jadrich filed a motion to suppress evidence. On March 23, 2012, the trial court held a hearing on Jadrich's suppression motion. On April 24, 2012, the trial court denied Jadrich's suppression motion. On January 18, 2013, a bench trial was conducted, and the parties submitted "Revised Stipulated Facts." The trial court found Jadrich guilty as charged, entered judgment of conviction for marijuana possession as a Class A misdemeanor and Class A misdemeanor paraphernalia possession, and sentenced Jadrich to 365 days of incarceration with 363 suspended to probation.

## DISCUSSION AND DECISION

### Whether the Trial Court Abused its Discretion in Admitting
### Evidence Found in Jadrich's Back Yard and House

Although Jadrich frames the issue as a challenge to the denial of his pretrial motion to suppress evidence, he actually appeals from the allegedly erroneous admission of evidence at

trial. The admissibility of evidence is within the sound discretion of the trial court. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002), *trans. denied*. We will only reverse a trial court's decision on the admissibility of evidence upon a showing of an abuse of that discretion. *Id*. An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id*. The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005), *trans. denied*. We do not reweigh the evidence and consider the evidence most favorable to the trial court's ruling. *Hirshey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006), *trans. denied*. Jadrich contends that the admission of the marijuana evidence found in his back yard violates both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution, arguing that Deputy Butterfield's act of opening the fence gate and walking into his backyard was unconstitutional.

## Fourth Amendment

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."

6

*Schmerber v. California*, 384 U.S. 757, 767 (1966). "In *Wolf* [*v. People of State of Colorado*, 338 U.S. 25, 27 (1949) (overruled on other grounds by *Mapp v. Ohio*, 367 U.S. 643 (1961)] we recognized '(t)he security of one's privacy against arbitrary intrusion by the police' as being 'at the core of the Fourth Amendment' and 'basic to a free society.'" *Id*.

Both parties agree that Deputy Butterfield entered the curtilage of Jadrich's home when he walked through the gate and into the back yard. As the United States Supreme Court has stated,

> The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself. The concept plays a part, however, in interpreting the reach of the Fourth Amendment. *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924), held that the Fourth Amendment's protection accorded "persons, houses, papers, and effects" did not extend to the open fields, the Court observing that the distinction between a person's house and open fields "is as old as the common law. 4 Bl. Comm. 223, 225, 226."
>
> We reaffirmed the holding of *Hester* in *Oliver v. United States*, [466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed. 214 (1984)]. There, we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. 466 U.S., at 180, 104 S.Ct., at 1742. We identified the central component of this inquiry as whether the area harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Ibid*. (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)).
>
> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. *See California v. Ciraolo*, 476 U.S. 207, 221, 106 S.Ct. 1809, 1817, 90 L.Ed.2d 210 (1986) (POWELL, J., dissenting) (citing *Care v. United*

7

*States*, 231 F.2d 22, 25 (CA10), *cert. denied*, 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461 (1956); *United States v. Van Dyke*, 643 F.2d 992, 993–994 (CA4 1981)).  We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions.  Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

*U.S. v. Dunn*, 480 U.S. 294, 300-01 (1987) (footnotes omitted).

As the Indiana Supreme Court has noted, however, not all police intrusions into the

curtilage violate the Fourth Amendment:

[P]olice entry onto private property and their observations do not violate the Fourth Amendment when the police have a legitimate investigatory purpose for being on the property and limit their entry to places visitors would be expected to go, such as walkways, driveways, and porches.  "The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open ...."  1 Wayne R. LaFave, Search and Seizure: A Treatise on The Fourth Amendment § 2.3(e), at 592-93 (4th ed. 2004) (internal quotations and footnotes omitted).  *See also United States v. French*, 291 F.3d 945, 953 (7th Cir. 2002) (quoting LaFave); *United States v. Reyes*, 283 F.3d 446, 465 (2d Cir. 2002), *cert. denied*, (quoting LaFave); *Divello v. State*, 782 N.E.2d 433, 437 (Ind. Ct. App. 2003), *trans. denied*, (quoting LaFave).
  Which areas of a given piece of real estate may reasonably be viewed as open to visitors is fact-specific.  The determination will "necessarily include consideration of the features of the property itself, such as the existence of walkways and fences or other obstructions to access or viewing, the location of primary residential entryways, as well as the nature or purpose for the visitor's call."  *Divello*, 782 N.E.2d at 438.

*Trimble v. State*, 842 N.E.2d 798, 802 (Ind. 2006), *adhered to on reh'g*, 848 N.E.2d 278 (Ind.

2006).

As an initial matter, we have little trouble concluding that the route to Jadrich's back

door is not one that visitors would reasonably view as open to the public. The record contains no indication of any impediments to approaching the front door, the door that Deputy Butterfield did, in fact, approach first. In contrast, the record contains numerous indications that the back door was not open to the general public. There was prominent signage on a tree by the driveway, a garage door by the back yard, and the closed gate leading to the back yard warning visitors not to trespass in the back yard and only to attempt to contact residents via the front door. The back yard was also fenced in with a gate that was latched, further indicating that the back door was not the preferred mode of approach for visitors. The only factor in favor of finding the backdoor to be the primary entrance for visitors is the presence of a paved sidewalk leading from the fence gate to the back patio, but we conclude that that is far outweighed by other considerations.

Having determined that Deputy Butterfield entered into an area of Jadrich's property not open to the general public, we must address the question of whether that entry can be constitutionally excused. Professor LaFave has recognized that "legitimate police business may occasionally take officers to parts of the premises not ordinarily used by visitors, as 'where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house.'" 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 2.3(f) (5th ed.). An examination of case law from Indiana and other jurisdictions is instructive.

The Indiana case closest to being on point is *Hardister v. State*, 849 N.E.2d 563 (Ind. 2006). In *Hardister*, police responded to a residence after receiving a report of illegal drug

9

activity, and, when they knocked on the door, two persons inside, upon realizing that police were at the door, fled toward the rear. *Id*. at 568. The police, believing that the two men might flee through a back door, followed a sidewalk from the front around to the back, where they observed, through a window, Hardister pouring a white powder down the drain of the kitchen sink. *Id*. The Indiana Supreme Court held that the tip concerning drug activity, the location of the residence in an area known for drug trafficking, and the duo's flight were circumstances that justified the officers' entry into the curtilage and approach to the secondary entrance in order to pursue their investigation. *Id*. at 571. Put another way, the officers' entry into the curtilage was justified by observations that indicated criminal activity might be afoot.

A survey of relevant case law reveals numerous instances where other jurisdictions have addressed the question of whether a police entry into a curtilage or approach to a secondary entrance was justified. In *Hardesty v. Hamburg Township*, 461 F.3d 646 (6th Cir. 2007), officers apprehended a minor for drunk driving and proceeded to the house where she claimed to have been drinking. *Id*. at 649. As the officers approached, they noticed a light go off inside the house, and, after receiving no response to their pounding on the front door, proceeded around to the back of the house where a back door could be accessed from a deck. *Id*. From their vantage point on the deck, officers made observations through the windows that caused them to enter the house. *Id*. at 649-50. In the civil case brought because of the allegedly illegal entry, the court concluded that the officers' actions were not unconstitutional, employing the following analysis:

Police officers are permitted to enter private property and approach the front door in order to ask questions or ask for consent to search the premises. But knocking at the front door will not always result in police officers being able to initiate the permitted conversation. The most obvious example is where nobody is at home. Even where someone is at home, knocking at the front door may go unheard. When the circumstances indicate that someone is home and knocking at the front door proves insufficient to initiate a conversation with the person sought, officers should not be categorically prevented from carrying out their investigative function. Therefore, we hold that where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage. In this case, there were indications that someone was present within the Hardesty home, knocking at the front door proved unsuccessful, proceeding around the house and onto the back deck was a reasonable step, and that step was directed towards initiating a conversation with the person or persons in the house. Therefore, the Hamburg officers' entry into the curtilage in order to effectuate the knock and talk investigative technique did not violate Plaintiffs' Fourth Amendment rights.

*Id*. at 654. The *Hardesty* court also noted that its approach was consistent with that taken in other Circuits. *Id*.

Several other Circuits and state courts have addressed similar issues, with the weight of authority being fully consistent with the holding in *Hardesty*. *See, e.g.*, *U.S. v. Taylor*, 458 F.3d 1201, 1204-05 (11th Cir. 2006) ("to the extent that the officers moved away from the front door and toward Taylor" when he walked out from behind the barn, "this small departure from the front door also does not trigger the protections of the Fourth Amendment"); *Alvarez v. Montgomery Cnty.*, 147 F.3d 354, 358 (4th Cir. 1998) (where police responding to 911 call about underage drinking party approached front door to notify residents of complaint but, seeing sign reading "Party In Back," walked around the house to the back yard where the party was going on and asked to see the host, such entry "did not

11

exceed their legitimate purpose for being there" and thus "satisfied the Fourth Amendment's reasonableness requirement"); *U.S. v. Anderson*, 522 F.2d 1296, 1300 (8th Cir. 1977) (concluding that an officer's entry into a back yard following an unsuccessful approach to a front door was constitutional where officers observed a light on in the residence and heard a dog barking behind it); *U.S. v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974), (concluding that an officer permissibly walked around to the back of the home in question, discovering incriminating evidence on the way, when there was some reason to believe that the resident, a suspected moonshiner, was inside at the time and an attempt at the front door was unsuccessful); *State v. Beane*, 770 N.W.2d 283, 288 (N.D. 2009) ("The officers' 'small departure' from the front door of the residence to meet Beane coming from the unattached garage also did not trigger the protections of the Fourth Amendment"); *State v. Dunn*, 172 P.3d 110, 113 (Mont. 2007) (defendant "did not have a reasonable expectation of privacy in his backyard area" vis-à-vis police entry to investigate neighbors' complaint of loud party there, where "noise was coming from the backyard"); *Tryon v. State*, 263 S.W.3d 475, 485 (Ark. 2007) (officer "did not violate Tryon's constitutional rights by merely walking into the backyard after he saw Tryon take off running"); *State v. Hider*, 649 A.2d 14, 15 (Me. 1994) (officer tracking thief from airport with tracking dog lawfully entered rear of defendant's curtilage where the officer discovered marijuana).[5]

---

[5] A holding going the other way but fully consistent with these cases is *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003), in which officers went to Robert Smith's residence to investigate a complaint from a neighbor. *Id*. at 501-02. When officers received no response at the front door, they went around to the back of house in search of Smith. *Id*. at 502. When in back, one officer noticed a red dot on the other officer and believed it to be a laser-sight from a firearm. *Id*. A series of events was triggered that culminated in Smith's death and a civil lawsuit filed against the officers by Smith's estate. *Id*. at 502-06.

12

In summary, seemingly unanimous authority requires some justification before a police officer may permissibly venture into spaces not normally used by the public, such as approaching a secondary entrance to a house located in the curtilage. In some cases, this entry is justified by a reasonable belief that a person may be contacted by such entry, and in others by observations that indicate possible criminal activity. The record contains no evidence that indicates such justifications in this case, as Deputy Butterfield did not observe or hear anything before entering Jadrich's back yard that would have led a reasonable person to believe that any criminal activity was afoot, anybody was in the back yard, or knocking on the back door was more likely to result in contact with anyone inside the house.

The State, however, argues that Deputy Butterfield's entry into Jadrich's back yard was justified by the purpose of his being there, namely to serve a protective order. As *Trimble* made clear, the nature and purpose of the visitor's call *can* be relevant in such cases. *Trimble*, 842 N.E.2d at 802. In *Divello*, which the *Trimble* court cited with approval, this court elaborated on this concept:

> The circumstances determining which portions of property may reasonably be

---

The Third Circuit held that

> [w]here officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident, as in [*U.S. v. Daoust*, 916 F.3d 757 (1st Cir. 1990)], where the front door was inaccessible. Similarly, officers reasonably may believe, based on the facts available to them, that the person they seek to interview may be located elsewhere on property within the curtilage [and] an officer's brief entry into the curtilage to test this belief might be justified.

*Id*. at 520. Applying these principles to the facts of the civil case against the officers, the *Marasco* court concluded that the trial court erred in granting the officers' summary judgment motion on the basis that their foray into Smith's back yard was constitutional. *Id*.

13

> viewed as open to visitors are determined on a case-by-case basis and will necessarily include consideration of the features of the property itself, such as the existence of walkways and fences or other obstructions to access or viewing, the location of primary residential entryways, as well as the nature or purpose for the visitor's call. Common experience teaches that under normal circumstances, uninvited visitors coming to a residence to speak with an owner or resident are expected to come to the residence's most direct, obvious and prominent entryway, which in most cases is its front door.
>
> Under most circumstances, uninvited visitors are also expected to leave by the same route after knocking on the front door and receiving no response. Of course, the nature of the circumstances surrounding the visit can also affect the scope of the property open by implication. For example, persons previously invited to access a residence by alternate entryways, or those coming on truly pressing or emergency matters could reasonably be expected to seek out residents through areas other than the front door.

*Divello*, 782 N.E.2d at 438.

The State has failed to convince us that Deputy Butterfield's purpose for being at Jadrich's home—to serve a civil protective order—justified his foray into the back yard. The State points to no authority suggesting that the service of protective orders is a purpose that excuses police entry into areas that are otherwise constitutionally protected and off-limits. Likewise, our research has uncovered no such authority. Moreover, while we acknowledge that the service of protective orders is an important official function, there is no indication in the record of any emergency or special urgency particular to the order at issue here. The State has failed to establish that Deputy Butterfield was justified in entering Jadrich's back yard, an area specifically designated as off-limits to visitors, which is where he was when he found the marijuana. Consequently, the trial court erred in admitting evidence regarding the marijuana found in Jadrich's back yard. As the State acknowledged at oral argument, a conclusion that evidence regarding the marijuana was erroneously admitted leads necessarily

14

to the conclusion that evidence regarding the smoking pipe was erroneously admitted as well. Without this evidence, both of Jadrich's convictions are fatally undercut.

We reverse the judgment of the trial court and remand with instructions to vacate both of Jadrich's convictions.

FRIEDLANDER, J., and BAILEY, J., concur.