

**FILED**

Aug 09 2018, 9:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ryan P. Dillon
Maritza K. Webb
Dillon Legal Group, P.C.
Franklin, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Jevon R. Bates-Smith,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 9, 2018

Court of Appeals Case No.
18A-CR-307

Appeal from the Morgan Superior
Court

The Honorable Peter R. Foley,
Judge

Trial Court Cause No.
55D01-1509-F2-1386

**Baker, Judge.**

[1] Jevon Bates-Smith appeals his conviction for Level 2 Felony Dealing in a Narcotic Drug.[1] Bates-Smith argues that the trial court erred by (1) admitting evidence stemming from a traffic stop that Bates-Smith contends was unconstitutional; and (2) admitting testimony in violation of the rule against hearsay evidence and the federal Confrontation Clause. Finding no error, we affirm.

## Facts

[2] Indiana State Police Detective Joshua Allen works for the drug enforcement section and is assigned to covert operations in an undercover role investigating people who deal in cocaine, heroin, and methamphetamine. He has been involved in over 500 criminal investigations related to controlled substances. Detective Allen often employs confidential informants (CIs), who are usually low-level drug users whose cooperation leads to the arrest of higher level targets. He has used CIs over 100 times in his career.

[3] In the summer of 2015, Detective Allen began working with a CI. This CI has heroin-related cases in his criminal history, though he had not yet been convicted of any drug offense. At some point, the CI told Detective Allen that he had purchased heroin from a dealer for whom the CI had a phone number and a vague description, but no name.

---

[1] Ind. Code § 35-48-4-1.

[4] The CI worked with officers to contact the heroin dealer, making multiple phone calls and many contacts before finally succeeding. On September 28, 2015, after Detective Allen and the CI had been working together for a few months, police officers were able to contact the dealer using the phone number provided by the CI. They set up a meeting to purchase heroin in the amount of $800. Detective Allen contacted various troopers, sheriff's deputies, and police officers, telling them to be out of sight at the planned meeting location and to be prepared to arrest the dealer after the controlled buy occurred.

[5] The plan was for the controlled buy to take place near a Steak 'n Shake restaurant and Wal-Mart plaza in Martinsville. Based on the CI's description, law enforcement was looking for a blue four-door passenger vehicle holding a slender, tall, Black male. Detective Allen and the CI waited for the vehicle to arrive.

[6] Detective Allen saw a blue four-door vehicle arrive and park in a lot near the restaurant. The detective and CI drove past the vehicle, which held two Black males. As they drove by, the CI's cell phone rang; Detective Allen noticed that the driver of the vehicle, later identified as Bates-Smith, was on his cell phone. The incoming call to the CI was from the same number officers had contacted to arrange the controlled buy. The CI identified Bates-Smith as the dealer. Evidently, Bates-Smith was contacting the CI to cancel the deal. Appellee's Br. p. 23.

[7] Bates-Smith began to drive his vehicle out of the parking lot. Detective Allen contacted the other law enforcement officials who were waiting nearby with instructions to stop the vehicle; Detective Allen drove the CI to a gas station and let him get out of the car so that he would not be identified by Bates-Smith or his passenger.

[8] As Bates-Smith was driving his vehicle, law enforcement officials followed it and turned on their lights and sirens. Bates-Smith continued to drive through the parking lot, with the officials in pursuit. As officials had blocked the parking lot exits, Bates-Smith eventually ran out of room and had to stop. His passenger, later identified as Jeremiah Moore, jumped out of the car while it was still moving. Moore tried to run away but was apprehended by law enforcement officials. He was instructed to get down onto the pavement in a spread-eagle position. He complied, and then repeatedly attempted to shove something into his mouth but was unable to swallow it. It was later determined that the object was a golf-ball-sized baggy containing heroin.

[9] At the same time, other officials were focused on Bates-Smith, who was still in the vehicle. He eventually agreed to exit the vehicle. A later search of the vehicle revealed a loaded pistol, five cell phones, scales, and multiple bags containing a total of approximately 25.06 grams of heroin.[2]

---

[2] Detective Allen later testified that in his experience, he has learned that a normal dose of heroin is one tenth of one gram. Tr. Vol. III p. 121.

On September 30, 2015, the State charged Bates-Smith with Level 2 felony dealing in a narcotic drug, Level 3 felony possession of a narcotic drug, Level 3 felony dealing in a narcotic drug, and Level 6 felony maintaining a common nuisance. On April 13, 2016, Bates-Smith filed a motion to suppress the evidence, arguing that the police had lacked reasonable suspicion to conduct the traffic stop. Following an August 25, 2017, hearing, the trial court denied the motion to suppress. Bates-Smith's jury trial took place on November 7 and 8, 2017, and the jury found him guilty as charged. The trial court merged all the offenses into the Level 2 felony conviction and sentenced Bates-Smith to twelve years imprisonment. Bates-Smith now appeals.

# Discussion and Decision

## I. Traffic Stop

Bates-Smith first argues that the trial court erred by admitting the evidence obtained as a result of the traffic stop, which he argues was unconstitutional. The admission of evidence is within the discretion of the trial court, and we will reverse only if the decision is clearly against the logic and effect of the facts and circumstances before the court. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002).

[12]     Both the United States and Indiana[3] Constitutions prohibit unreasonable searches and seizures by the government, including brief investigatory stops of persons or vehicles. *Clarke v. State*, 868 N.E.2d 1114, 1117 (Ind. 2007). In this case, the stop was not based on a warrant, so the burden was on the State to show that there was an exception to the general requirement of a warrant. *Coleman v. State*, 847 N.E.2d 259, 262 (Ind. Ct. App. 2006).

[13]     The exception at issue in this case was set forth by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). The *Terry* Court held that law enforcement officials may briefly detain a person for investigatory purposes with only a reasonable suspicion that criminal activity is occurring. *Moultry v. State*, 808 N.E.2d 168, 170-71 (Ind. Ct. App. 2004). The determination of reasonable suspicion is based on whether the officer had a particularized and objective basis for suspecting legal wrongdoing in light of the totality of the circumstances. *Id.* at 171.

[14]     Under certain circumstances, a CI's tip may provide the basis of a *Terry* stop. *Coleman*, 847 N.E.2d at 262. In *Parker v. State*, this Court considered when such a tip provides sufficient indicia of reliability to justify an investigatory stop. 662 N.E.2d 994, 996-98 (Ind. Ct. App. 1996). The *Parker* Court found the CI's tip in that case to be sufficient because "the officers relied on the tip of a known

---

[3] Although Bates-Smith initially names both constitutions, his analysis focuses solely on the United States Constitution. Therefore, we will not conduct a separate analysis under the Indiana Constitution. We note, however, that even if we did so, the result would not change.

informant who provided the information over the phone and in person, gave specific verifiable details, accurately predicted [the defendant's] future actions, and had provided information in the past that led to other narcotics convictions." *Id.* at 997. The *Parker* Court also emphasized that the reliability of a CI's tip need not rise to the level needed to justify an arrest or search warrant. *Id.* at 996.

[15] Bates-Smith directs our attention to *Coleman v. State* in support of his contention that the stop in this case was unconstitutional. In *Coleman*, a new CI who was unknown to police contacted a sergeant and told him that he had previously bought cocaine at the mall from a man named "J.C." 847 N.E.2d at 261. The CI then called J.C. and arranged to meet him at the mall later that day to buy crack cocaine. Police transported the CI to the buy in an unmarked police vehicle. From inside the vehicle, the CI identified a man waiting outside of a department store as J.C.; it was eventually determined that "J.C." was Coleman. After the CI identified the man, a uniformed officer stopped Coleman and asked if he was J.C. Coleman replied affirmatively, and the officer asked Coleman if he could conduct a pat-down search of his person. Coleman agreed, and the officer found a digital scale, illegal drug residue, and parts of plastic baggies. Coleman was arrested and a subsequent search of his vehicle revealed cocaine. *Id.*

[16] On appeal, this Court considered whether the CI's tip had sufficient indicia of reliability to justify the stop. We found that it did not:

Here, our review of the record indicates that in stopping Coleman, the police officers relied on the C.I.'s initial tip, his subsequent telephone conversation with "J.C." arranging the meeting, and then finally his identification of Coleman as "J.C." at the pre-determined meeting place. The record further reveals that the C.I. was not a well-known informant, but rather had only given the police one reliable tip in the past, on the very same day that he provided the tip about Coleman. Also, the record discloses that the officers were only able to hear the C.I.'s side of the telephone conversation in arranging the meeting with "J.C."; thus, the police officers relied entirely on the C.I.'s statement that "J.C." would be waiting at the mall and would have cocaine with him. While the C.I. did give a general description of "J.C." as a 5'10" African American male, approximately thirty (30) years old, the record fails to show that the C.I. gave any specific description of "J.C." prior to identifying him.

We find that this set of facts presents us with a close case. However, under the totality of the circumstances, we ultimately conclude that the officers here lacked the requisite reasonable suspicion to stop Coleman. . . . [T]he officers here relied on a new informant who gave a tip consisting of little detail. The record shows that the C.I. had no history of drug-related crimes, and in fact was in custody on his first offense of any sort. In . . . our review of the record, we also find that the officers did not independently investigate the tip on Coleman prior to stopping him. Although C.I.'s telephone conversation with "J.C." was corroborated by "J.C.'s" presence at the mall, the officers had a limited history with C.I., and little guarantee that he was telling the truth. Thus, the police officers could not corroborate that the man waiting in front of the department store was in fact "J.C." until after they stopped him. Also, Officer Long testified at the hearing on the Motion to Suppress that he did not observe Coleman committing a crime, or even acting suspiciously, before he stopped him. . . .

In addition, we have concerns as to the hastiness of the police work in Coleman's case. From the record, it is apparent that the Greenwood Police Department conducted several pre-arranged drug buys and made numerous drug-related arrests the day Coleman was arrested. And while the record is void as to the amount of investigating that preceded the other arrests that day, the record here indicates that the police officers met with the C.I., set up the meeting between the C.I. and Coleman, and arrested Coleman all in one day. . . .

847 N.E.2d at 263-64. We ultimately reversed the trial court's order denying Coleman's motion to suppress.

[17] Bates-Smith argues that this case is similar to *Coleman* and, consequently, his conviction should be reversed. Although there are some similarities, we disagree that *Coleman* compels a reversal. In this case, the CI was known to Detective Allen because the detective had worked on criminal cases in which the CI was a suspect. Indeed, the CI was assisting the police because he was trying to strike a bargain for leniency on another criminal case. And although there was not a years-long relationship between police and the CI, Detective Allen testified that he had worked with the CI for a few months before the incident involving Bates-Smith.

[18] With respect to Bates-Smith, officers and the CI had attempted to arrange the deal by multiple phone calls before finally succeeding. In other words, the call that set up the deal for September 28, 2015, was the culmination of a number of efforts to arrange the deal; it was the final call in a series of contacts between this CI and Bates-Smith. Unlike *Coleman*, this was not a same-day, hastily

arranged buy. Additionally, facts provided by the CI that were immediately verifiable at the scene—before the stop—include the location of the deal, the time of the deal, a physical description of Bates-Smith, the phone number of Bates-Smith, a description of Bates-Smith's vehicle, and on-site identification of the dealer as Bates-Smith.[4] Additionally, Detective Allen observed Bates-Smith on his phone at the same time the dealer was talking with the CI, and Bates-Smith drove his vehicle off the lot after the dealer told the CI he was cancelling the deal.

[19] When examining the totality of the circumstances surrounding the controlled buy, we find that the CI's information regarding Bates-Smith had sufficient indicia of reliability to provide the officers with a particularized and objective basis for suspecting legal wrongdoing. In other words, the State met its burden of showing that a *Terry* stop was proper in this case. Therefore, the trial court did not err by admitting the evidence stemming from that stop.

## II. Detective Allen's Testimony

[20] Bates-Smith also argues that the trial court erred by permitting Detective Allen to testify because his testimony relied in part on information he learned from the CI. As such, Bates-Smith contends that the testimony was impermissible

---

[4] To the extent the State attempts to rely on things that occurred *after* officers attempted to stop Bates-Smith, we note that using those events would constitute an impermissible argument amounting to "the ends justify the means." The facts that Bates-Smith fled from police officers, that his passenger jumped out of a moving vehicle, or that his passenger attempted to swallow a bag of heroin, cannot possibly answer the question of whether the stop was proper to begin with. To answer that question, we must examine what the officers knew *before* the stop occurred.

hearsay that, in addition to violating the rules of evidence, violated his rights under the Confrontation Clause of the United States Constitution.

[21] We must first determine whether the testimony constituted inadmissible hearsay. Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). In some circumstances, conduct itself can constitute hearsay when it indicates an implied assertion by the declarant. *Watt v. State*, 412 N.E.2d 90, 96 (Ind. Ct. App. 1980).

[22] Bates-Smith directs our attention to the following testimony, which he argues is inadmissible hearsay:

> During the jury trial, Detective Allen testified that he "visually observed the CI dial a phone number" to arrange the purchase of heroin, (Tr. Vol. 3, p. 51), he then drove the informant to the place in which the CI had arranged for the purchase, outside the Steak N Shake in Martinsville, (Tr. Vol. 3, p. 53). Detective Allen then testified that he and the CI waited for a "blue four door passenger vehicle containing a tall, slender, black male with tattoos on his arms." (Tr. Vol. 3, p. 55).

Appellant's Br. p. 19. According to Bates-Smith, this testimony is rooted in the inadmissible hearsay statements of the CI, who did not testify at trial.

[23] We disagree. Assuming for argument's sake that the verbal and non-verbal statements made by the CI amounted to statements underlying Detective Allen's testimony, the statements are not hearsay because they were not offered for the truth of the matter asserted. Instead, they were offered to explain the

course of the investigation and to show the reason the officers stopped Bates-Smith's vehicle. *See Johnston v. State*, 530 N.E.2d 1179, 1181 (Ind. 1988) (holding that testimony that would otherwise be hearsay is admissible when it is offered to explain the course of police investigation rather than for the truth of the matter asserted).

[24] In some cases, it has been held that a detective's testimony about statements made by a CI was, indeed, offered for the truth of the matter asserted. *See Mason v. State*, 689 N.E.2d 1233, 1235 (Ind. 1999) (detective's testimony inadmissible because testimony was presented for the truth of assertion that defendant was dealing drugs and was not limited to explaining what prompted police investigation). We find that this is not such a case. Detective Allen's testimony that was based on information gained from the CI was offered solely to explain the course of the investigation. The State proved its charges against Bates-Smith based on what happened *after* the stop; Detective Allen merely offered the prologue to the story. Therefore, the trial court did not err by admitting this testimony.

[25] Because the statements complained of by Bates-Smith were not hearsay, their admission did not violate his rights under the federal Confrontation Clause. *See, e.g.*, *Vaughn v. State*, 13 N.E.3d 873, 879 (Ind. Ct. App. 2014) (observing that "if a statement is either nontestimonial or nonhearsay, the federal Confrontation Clause will not bar its admissibility at trial"). Therefore, this argument is unavailing.

The judgment of the trial court is affirmed.

May, J., and Robb, J., concur.